## LOAN AGREEMENT

**between**

**900 CESAR CHAVEZ, LLC, 905 CESAR CHAVEZ, LLC,
5TH AND RED RIVER, LLC and 7400 SOUTH CONGRESS, LLC,**
**each, a Delaware limited liability company**

**COLLECTIVELY, AS BORROWER**

**and**

**U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**
**an Irish limited partnership**

**AS LENDER**

**Executed as of September 21, 2018**

**EXHIBIT "2"**

ATX000016

## TABLE OF CONTENTS

Page

**ARTICLE 1. DEFINITIONS** ...................................................................................................... 2
    1.1        INCORPORATION OF EXHIBITS AND SCHEDULE .............................................. 2
    1.2        DEFINED TERMS .................................................................................................... 2

**ARTICLE 2. LOAN** ..................................................................................................................... 9
    2.1        LOAN ........................................................................................................................ 9
    2.2        MATURITY DATE .................................................................................................... 9
    2.3        FUNDING OF LOAN ................................................................................................ 9
    2.4        ADDITIONAL RESERVES ..................................................................................... 13
    2.5        DISTRIBUTION OF CASH FLOW. ....................................................................... 14

**ARTICLE 3. DISBURSEMENT** ............................................................................................... 15
    3.1        CONDITIONS PRECEDENT TO DISBURSEMENTS ........................................... 15

**ARTICLE 4. BORROWER'S EQUITY** ................................................................................... 21
    4.1        COMMITMENT ...................................................................................................... 21

**ARTICLE 5. INSURANCE** ....................................................................................................... 21
    5.1        PROPERTY INSURANCE ...................................................................................... 22
    5.1        BOILER AND MACHINERY INSURANCE. ........................................................ 22
    5.2        FLOOD INSURANCE. ............................................................................................ 22
    5.3        EARTHQUAKE INSURANCE. ............................................................................... 22
    5.4        TERRORISM INSURANCE. ................................................................................... 22
    5.5        LIABILITY INSURANCE. ...................................................................................... 22
    5.6        CONSTRUCTION. .................................................................................................. 22
    5.7        GENERAL. .............................................................................................................. 23

**ARTICLE 6. REPRESENTATIONS AND WARRANTIES** ................................................ 23
    6.1        AUTHORITY/ENFORCEABILITY ....................................................................... 23
    6.2        BINDING OBLIGATIONS ..................................................................................... 24
    6.3        FORMATION AND ORGANIZATIONAL DOCUMENTS .................................... 24
    6.4        NO VIOLATION. ..................................................................................................... 24
    6.5        COMPLIANCE WITH LAWS ................................................................................ 24
    6.6        LITIGATION .......................................................................................................... 24
    6.7        FINANCIAL CONDITION ..................................................................................... 24
    6.8        NO MATERIAL ADVERSE CHANGE .................................................................. 24
    6.9        ACCURACY ............................................................................................................ 25
    6.10    TAX LIABILITY ..................................................................................................... 25
    6.11    COMPLIANCE ....................................................................................................... 25
    6.12    ERISA ...................................................................................................................... 25
    6.13    BUSINESS LOAN ................................................................................................... 25
    6.14    PROPERTY MANAGEMENT AGREEMENT ...................................................... 25
    6.15    MATERIAL AGREEMENTS. ................................................................................. 25
    6.16    LEASES .................................................................................................................. 26
    6.17    PATRIOT ACT AND RELATED MATTERS ....................................................... 26
    6.18    NO BANKRUPTCY ................................................................................................ 26

ATX000017

# TABLE OF CONTENTS *(continued)*

Page

6.19    NOT FOREIGN PERSON ........................................................................ 26
6.20    PURCHASE AGREEMENT .................................................................. 26

**ARTICLE 7. HAZARDOUS MATERIALS ........................................................... 27**
7.1    SPECIAL REPRESENTATIONS, WARRANTIES .......................... 27
7.2    LEGAL EFFECT OF SECTION ............................................................ 30

**ARTICLE 8. RECONVEYANCE ............................................................................... 30**
8.1    FULL REPAYMENT AND RECONVEYANCE .............................. 30

**ARTICLE 9. COVENANTS OF BORROWER ...................................................... 31**
9.1    EXPENSES .............................................................................................. 31
9.2    ERISA COMPLIANCE ........................................................................ 31
9.3    LEASING ................................................................................................ 31
9.4    APPLICATION OF GROSS OPERATING INCOME .................... 32
9.5    SUBDIVISION MAPS ......................................................................... 32
9.6    FURTHER ASSURANCES .................................................................. 32
9.7    ASSIGNMENT ...................................................................................... 32
9.8    [RESERVED.] ......................................................................................... 32
9.9    TRANSFERS .......................................................................................... 33
9.10    SINGLE PURPOSE ENTITY ............................................................. 33
9.11    MATERIAL AGREEMENTS. ............................................................ 35
9.12    COMPLETION OF REQUIRED CAPITAL IMPROVEMENTS AND TENANT IMPROVEMENTS COMMENCED BY BORROWER ................ 35
9.13    IN-BALANCE ........................................................................................ 36
9.14    BORROWER EQUITY ........................................................................ 36
9.15    LOAN TO VALUE RATIO. ................................................................ 36
9.16    PROPERTY MANAGEMENT AGREEMENT ............................... 36
9.17    MAINTENANCE .................................................................................. 37
9.18    UTILITIES. ............................................................................................. 37
9.19    NO CHANGE IN USE ......................................................................... 37
9.20    PATRIOT ACT AND RELATED MATTERS .................................. 37

**ARTICLE 10. REPORTING COVENANTS ......................................................... 37**
10.1    FINANCIAL INFORMATION ........................................................... 37
10.2    BOOKS AND RECORDS .................................................................... 38
10.3    MONTHLY PROGRESS REPORTS ON RENOVATION TIMELINE ...... 38
10.4    LEASING REPORTS ............................................................................ 38
10.5    OPERATING STATEMENTS FOR PROPERTY AND IMPROVEMENTS ........................................................................................... 38
10.6    BUDGET ................................................................................................ 39

**ARTICLE 11. EVENTS OF DEFAULT AND REMEDIES ................................. 39**
11.1    EVENT OF DEFAULT ........................................................................ 39
11.2    ACCELERATION UPON EVENT OF DEFAULT; REMEDIES .................. 41
11.3    DISBURSEMENTS TO THIRD PARTIES ...................................... 41
11.4    LENDER'S COMPLETION OF CONSTRUCTION ....................... 41
11.5    REPAYMENT OF FUNDS ADVANCED ....................................... 42
11.6    RIGHTS CUMULATIVE, NO WAIVER ......................................... 42

## TABLE OF CONTENTS *(continued)*

Page

**ARTICLE 12. MISCELLANEOUS PROVISIONS** .................................................................. **42**

12.1      INDEMNITY ................................................................................................ 42

12.2      FORM OF DOCUMENTS ........................................................................... 42

12.3      NO THIRD PARTIES BENEFITED ............................................................ 42

12.4      NOTICES ..................................................................................................... 43

12.5      ATTORNEY-IN-FACT ............................................................................... 43

12.6      ACTIONS .................................................................................................... 44

12.7      RIGHT OF CONTEST ................................................................................. 44

12.8      RELATIONSHIP OF PARTIES ................................................................... 44

12.9      DELAY OUTSIDE LENDER'S CONTROL ................................................ 44

12.10    ATTORNEYS' FEES AND EXPENSES; ENFORCEMENT ........................ 44

12.11    IMMEDIATELY AVAILABLE FUNDS ..................................................... 44

12.12    LENDER'S CONSENT ................................................................................ 44

12.13    LOAN SALES AND PARTICIPATIONS; DISCLOSURE OF INFORMATION ......................................................................................... 45

12.14    SECONDARY MARKET TRANSACTION; DISCLOSURE OF INFORMATION ......................................................................................... 45

12.15    RESERVED .................................................................................................. 46

12.16    LENDER'S AGENTS .................................................................................. 46

12.17    TAX SERVICE ............................................................................................ 46

12.18    WAIVER OF RIGHT TO TRIAL BY JURY ............................................... 46

12.19    SEVERABILITY ......................................................................................... 46

12.20    HEIRS, SUCCESSORS AND ASSIGNS ..................................................... 47

12.21    TIME ........................................................................................................... 47

12.22    HEADINGS ................................................................................................. 47

12.23    GOVERNING LAW ..................................................................................... 47

12.24    INTEGRATION; INTERPRETATION ........................................................ 47

12.25    JOINT AND SEVERAL LIABILITY .......................................................... 47

12.26    COUNTERPARTS ....................................................................................... 47

12.27    CONFIDENTIALITY AND PUBLICITY .................................................... 47

12.28    BROKERS ................................................................................................... 48

12.29    OFFSETS AND COUNTERCLAIMS .......................................................... 48

12.30    REMEDIES OF BORROWER ..................................................................... 48

12.31    PRINCIPLES OF CONSTRUCTION .......................................................... 48

ATX000019

## TABLE OF CONTENTS *(continued)*

<u>Page</u>

**<u>SCHEDULES</u>**

Schedule I          Borrower's Organizational Chart


**<u>EXHIBITS</u>**

Exhibit A-1
through A-4      Description of the Property

Exhibit B          Documents

Exhibit C          Budgets

Exhibit D          Financial Requirements Analysis

Exhibit E          Form of Disbursement Request

Exhibit F          Rent Roll and List of Leases

**ATX000020**

## LOAN AGREEMENT

**THIS LOAN AGREEMENT** (this "Agreement") is dated as of September 21, 2018, by and between **900 CESAR CHAVEZ, LLC, 905 CESAR CHAVEZ, LLC, 5TH AND RED RIVER, LLC and 7400 SOUTH CONGRESS, LLC**, each a Delaware limited liability company (jointly, severally and collectively, as the context may require, "Borrower"), and **U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP**, an Irish limited partnership (together with its successors and assigns, "Lender").

## R E C I T A L S

A.     Borrower is or on the closing date will be the owner in fee simple of land located at (i) 504 E. 5th Street, Austin, Texas, and legally described on Exhibit A-1 attached hereto and incorporated herein by reference (the "5th Real Property"), (ii) 900 & 904 East Cesar Chavez Street, Austin, Texas, and legally described on Exhibit A-2 attached hereto and incorporated herein by reference (the "900 Cesar Chavez Real Property"), (iii) 905 & 907 East Cesar Chavez Street, Austin, Texas, and legally described on Exhibit A-4 attached hereto and incorporated herein by reference (the "905 Cesar Chavez Real Property") and (iv) 7400 South Congress Avenue, Austin, Texas, and legally described on Exhibit A-5 attached hereto and incorporated herein by reference (the "Congress Real Property" and together with the 5th Real Property, the 900 Cesar Chavez Real Property and the 905 Cesar Chavez Real Property, individually and collectively as the context may require, the "Real Property"). (1) The 5th Real Property consists of approximately 0.60 acres and contains an approximately 11,000 square foot building that formerly housed "Carmelo's Italian" restaurant and the site is entitled for 662,700 square feet of vertical development, (2) the 900 Cesar Chavez Real Property consists of approximately 0.5577 acres and is a development site, (3) the 905 Cesar Chavez Real Property consists of approximately 0.2988 acres and is a development site, and (4) the Congress Real Property consists of approximately 7.52 acres and is a development site (collectively, together with all "Improvements" referenced in the Security Instrument (defined below), collectively, the "Improvements"). As used herein, (i) the term "5th Property" shall collectively mean the 5th Real Property and the Improvements thereon, all related personal property, (ii) the term "900 Cesar Chavez Property" shall collectively mean the 900 Cesar Chavez Real Property and the Improvements thereon, all related personal property, (iii) the term "905 Cesar Chavez Property" shall collectively mean the 900 Cesar Chavez Real Property and the Improvements thereon, all related personal property, (iv) the term "Congress Property" shall collectively mean the Congress Real Property and the Improvements thereon, all related personal property and (vi) the 5th Property, the 900 Cesar Chavez Property, the 90 Cesar Chavez Property and the Congress Property are individually referred to herein as a "Property" and collectively, the "Properties".

B.     Borrower has applied to Lender for a loan in the amount of up to TWENTY TWO MILLION NINE HUNDRED THIRTY TWO THOUSAND TWO HUNDRED FIFTY AND NO/100 DOLLARS ($22,932,250.00) (the "Loan") for the acquisition of each Real Property and for certain costs related thereto, and Lender is willing to make the Loan on the terms and conditions hereinafter set forth. The Loan is evidenced by, among other things, that certain Promissory Note, dated as of the date hereof made by Borrower in the original principal amount of $22,932,250.00 of which $16,832,250 shall be funded on the date hereof and payable to Lender (such Promissory Note, together with all amendments, modifications and/or supplements thereto are hereinafter collectively referred to as the "Note"). The terms and provisions of the Note are hereby incorporated by reference in this Agreement.

C.     Borrower's obligations under the Loan will be secured by, among other items, a first priority Deed of Trust, Security Agreement and Financing Statement dated as of the date hereof, from Borrower to the trustee named therein for the benefit of Lender encumbering each Property, and granting Lender a first priority lien in each Property (such Deed of Trust, Security Agreement and Financing

1

ATX000021

Statement, together with amendments, modifications and/or supplements  thereto is hereinafter referred to as the "Security Instrument").

NOW, THEREFORE, in consideration of the foregoing premises, the covenants, conditions and agreements contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledge, Borrower and Lender agree as follows:

## ARTICLE 1.
## DEFINITIONS

**1.1** **INCORPORATION OF EXHIBITS AND SCHEDULE**.  Schedule I and Exhibits A through F to this Agreement, attached hereto are incorporated in this Agreement and expressly made a part hereof by this reference.

**1.2** **DEFINED TERMS**.  The following capitalized terms generally used in this Agreement shall have the meanings defined or referenced below.  Certain other capitalized terms used only in specific sections of this Agreement are defined in such sections.

"ADA" means the Americans with Disabilities Act, 42 U.S.C. §§ 12101, et. seq. as now or hereafter amended or modified.

"Additional Borrower Equity" means an amount not less than One Million One Hundred Sixty Thousand and No/100 Dollars ($1,160,000.00) of unborrowed funds which Borrower shall cause to be contributed to, or applied in payment of, the costs and expenses incurred by Borrower in connection with future capital expenditures of the Properties in accordance with the Approved Budget.

"Affiliate" of any Person means (a) any other Person which directly or indirectly, through one or more intermediaries, Controls, is Controlled by, or is under common Control with, such Person, (b) any other Person with five percent (5%) or more of the equity interest of which is held beneficially or of record by such Person (in each case, directly or indirectly), (c) with respect to Borrower or any Guarantor, any partner or member in Borrower or any Guarantor (other than partners or members that obtain an interest in Borrower or Guarantor in violation of the terms of the Loan Documents), and (d) any Guarantor or Borrower.

"Affiliate Fees" shall have the meaning ascribed to such term in Section 3.1.1(z) hereof.

"Agreement" shall have the meaning ascribed to such term in the preamble hereto.

"Applicable Laws" shall have the meaning ascribed to such term in Section 6.17 hereof.

"Approved Budget" shall have the meaning ascribed to such term in Section 10.6 hereof.

"Approved Leases" means (a) executed Leases, each of which must be with non-Affiliated third parties and comply with the terms and conditions of Section 9.3, and (b) Leases otherwise approved, in writing, by Lender, and, in any case, as of the date of determination, the tenant under each Lease must be in occupancy of the leased premises, must have commenced rent payments to Borrower, and must not have materially defaulted or made a claim that Borrower has defaulted under the Lease.

"Approved Plans and Specifications" shall have the meaning ascribed to such term in Section 3.1.2(l)(b) hereof.

ATX000022

"Bankruptcy" means with respect to any Person, if such Person (a) makes an assignment for the benefit of creditors, (b) files a voluntary petition in bankruptcy, (c) is adjudged a bankrupt or insolvent, or has entered against itself an order for relief, in any bankruptcy or insolvency proceeding, (d) files a petition or answer seeking for itself any reorganization, arrangement, composition, readjustment, liquidation, dissolution or similar relief under any statute, law or regulation, (e) files an answer or other pleading admitting or failing to contest the material allegations of a petition filed against it in any proceeding of this nature, (f) seeks, consents to or acquiesces in the appointment of a trustee, receiver or liquidator of the Person or of all or any substantial part of its properties, or (g) if 120 days after the commencement of any proceeding against the Person seeking reorganization, arrangement, composition, readjustment, liquidation, dissolution, or similar relief under any statute, law or regulation, if the proceeding has not been dismissed, or if within ninety (90) days after the appointment, without such Person's consent or acquiescence, of a trustee, receiver or liquidator of such Person or of all or any substantial part of its properties, the appointment is not vacated or stayed, or within 90 days after the expiration of any such stay, the appointment is not vacated.

"Bankruptcy Code" means the Bankruptcy Reform Act of 1978 (11 USC § 101-1330) as now or hereafter amended or recodified.

"Borrower" shall have the meaning ascribed to such term in the preamble hereto.

"Borrower Equity" means an amount not less than Eight Million Eighty Two Thousand Seven Hundred Fifty and No/100 Dollars ($8,082,750) of unborrowed funds which Borrower shall cause to be contributed to or applied in payment of the costs and expenses incurred by Borrower in connection with Borrower's acquisition of the Properties.

"Business Day" means a day of the week (but not a Saturday, Sunday or public holiday on which the banking institutions in California or Texas are authorized or required by law to be closed) on which the offices of Lender are open to the public for carrying on substantially all of Lender's business functions. Unless specifically referenced in this Agreement as a Business Day, all references to "days" shall be to calendar days.

"Capital Holdback" shall have the meaning ascribed to such term in Section 2.3(b)(C)(1).

"Capital Improvement Budget" means the capital budget, if any, delivered to, as may be amended or updated from time to time pursuant to Section 10.6.

"Carveout Guaranty" means the Indemnity and Guaranty Agreement dated as of the date hereof, made by Guarantor in favor of Lender, as modified, amended and/or supplemented from time to time.

"Code" means the Internal Revenue Code of 1986, as amended.

"Collateral" shall have the meaning ascribed to such term in the Security Instrument.

"Construction Budget" means a detailed budget for the development of the Property, which construction budget shall be in form and substance acceptable to Lender.

"Construction Commencement" means Borrower has completed all preconstruction engineering and design, has received all necessary licenses, permits and local environmental approvals, has engaged all contractors and has ordered all essential equipment and supplies as, in each case, can reasonably be considered necessary such that physical construction at the Property can proceed to completion without

ATX000023

interruption (including, at a minimum, excavation for foundations and the installation or erection of Improvements), all in accordance with applicable laws, this Agreement and the other Loan Documents.

"Construction Documents" means, collectively, the Plans and Specifications, the architect's contract, the engineer's contract, the construction contract, the Construction Budget, and all drawings, plans, renderings, budgets, contracts, agreements, documents, instruments, consents, licenses, permits, authorizations and approvals relating to the design, development, construction, completion, management, use and occupancy of the Improvements, together with all service contracts, supply contract and other material agreements entered into as of the date hereof by Borrower in connection with the Improvements.

"Construction Manager" means consultant selected in Lender's sole discretion to manage any or all aspects of the construction and completion of any portion of the Improvements at any Property.

"Construction Plans and Specifications" shall include all plans, maps, sketches diagrams, surveys, drawings, specifications or lists of materials or any changes or modifications thereof in connection with the initial construction of Improvements, all of which shall have been delivered to and approved by Lender, as the same may be amended from time to time with the written consent of Lender in accordance with the terms of this Agreement.

"Construction Schedule" means a schedule for completion of the work to be performed under the Construction Budget, in form and substance acceptable to Lender.

"Control" means the possession, directly or indirectly, of the power to cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract, family relationship or otherwise.  Controlled and Controlling shall have correlative meanings.

"Default" means an event, omission or condition, that, with the giving of notice or lapse of time or both, would constitute an Event of Default.

"Deposit Account Control Agreement" means an agreement between Lender, Borrower and the Depository, in connection with the Account, in form and substance acceptable to Lender.

"Effective Date" means the first date Lender disburses any funds into escrow (and, in all events, interest or amounts funded and deemed funded shall begin to accrue interest on the date Lender disburses any funds into escrow).

"Environmental Indemnity Agreement" means that certain Hazardous Substances Indemnity Agreement dated as of the date hereof, executed by Borrower and Guarantor, collectively, in favor of Lender , as modified, amended and/or supplemented from time to time.

"Environmental Laws" shall have the meaning ascribed to such term in Section 7.1(a) hereof.

"Environmental Report" means, collectively, that certain Phase I Environmental Site Assessment (a) dated July 19, 2018 and prepared by Global Realty Services Group, Project No. 18-35995.1, with respect to the 5th Property; (b) dated March 16, 2018 and prepared by CBRE Inc., Project No. PC80242027, with respect to the 900 Cesar Chavez Property; (c) dated July 17, 2018 and prepared by Global Realty Services Group, Project No. 18-36145.1, with respect to the 905 Cesar Chavez Property; and (d) dated May 30, 2018 and prepared by Global Realty Services Group, Project No. 18-35490.1, with respect to the Congress Property, In each case, for the benefit of Lender.

ATX000024

"ERISA" means the Employee Retirement Income Security Act of 1974, and any regulations issued pursuant thereto, as now or from time to time hereafter in effect.

"Event of Default" shall have the meaning ascribed to such term in Section 11.1 hereof.

"Exit Fee" shall mean have the meaning ascribed to such term in Section 13 of the Note.

"Future Advance Funding Amount" shall have the meaning ascribed to such term in Section 2.3(b).

"Extension Term" shall mean have the meaning ascribed to such term in Section 1(f) of the Note

"GAAP" means generally accepted accounting principles in the United States of America as of the date of the applicable financial report.

"Governmental Authority" means any federal, state, county or municipal government, or political subdivision thereof, any governmental or quasi-governmental agency, authority, board, bureau, commission, department, instrumentality or public body, or any court or administrative tribunal.

"Gross Operating Income" shall have the meaning ascribed to such term in Section 10.5(a) hereof.

"Gross Rents" means an amount equal to the scheduled rent payments from each Property.

"Guarantor" means Natin Paul, an individual, and with respect to any other guaranty now or hereafter executed in connection with the Loan, any other Person who, or which, in any manner, is or becomes obligated to Lender thereunder (collectively or jointly and severally as the context thereof may suggest or require).

"Hazardous Substances" shall have the meaning ascribed to such term in Section 7.1(a) hereof.

"Holdbacks" means, collectively, the Interest Holdback and the Capital Holdback.

"Improvements" shall have the meaning ascribed to such term in Recital A hereof.

"In-Balance" shall have the meaning ascribed to such term in Section 9.13.

"Initial Funding Amount" shall have the meaning ascribed to such term in Section 2.3(a).

"Interest Holdback" shall have the meaning ascribed to such term  in Section 2.3(b)(A)(1).

"Interest Reserve Deficiency" means that Lender concludes in Lender's sole but reasonable discretion that the existing available amounts in the Interest Holdback may be insufficient to pay interest under the Loan through the one (1) year anniversary of the Effective Date,  as follows:  based on Net Operating Income derived from then Approved Leases at the time such determination is made and calculated using the debt service on the Loan which is anticipated to accrue for the period at the Note Rate (as defined in the Note) which would be in effect under the Note during the remaining Loan term period.

"Investment Party" means any actual or potential purchaser, transferee, assignee, lender, secured party, servicer, participant or investor in a Secondary Market Transaction.

"Leases" means any lease, occupancy agreement, sublease or other agreement creating possessory rights in all or any portion of any Property.

ATX000025

"Lender" shall have the meaning ascribed to such term in the preamble hereto.

"Lender Expenses" shall have the meaning ascribed to such term in <u>Section 2.3(a)</u> hereof.

"Loan" shall have the meaning ascribed to such term in Recital B hereof.

"Loan Commitment Fee" shall have the meaning ascribed to such term in the Note.

"Loan Documents" means those documents, as hereafter modified, amended and/or supplemented from time to time, properly executed and in recordable form, if necessary, set forth on <u>Exhibit B</u> hereof as Loan Documents.

"Loan-to-Value Ratio" means the ratio of (a) the outstanding principal amount of the Loan as of the date in question, to (b) the appraised value of the Properties as of such date, as determined by Lender in its sole but good faith discretion whether pursuant to its underwriting practices or an updated appraisal, which determination shall be conclusive absent manifest error.

"Lockbox Agreement" means that certain Lockbox and Security Agreement, between Borrower and Lender, in form and substance acceptable to Lender.

"Material Agreements" means (i) each Lease, (ii) each management, brokerage or leasing agreement, and (iii) any agreement of any kind (other than the Leases) of a material nature (materiality for purposes of this definition shall mean any contract with a term longer than one year or any contract that is not cancelable on thirty (30) days' or less notice without the payment of any termination fee or payments of any kind), in either case relating to the ownership, development, leasing, management, use, operation, maintenance, repair, improvement or restoration of any Property, whether written or oral.

"Maturity Date" shall have the meaning ascribed to such term in the Note.

"Net Operating Income" means: an amount equal to the Gross Rents for the period being measured, based on Approved Leases; plus the expense reimbursements for the period in question pursuant to such Approved Leases; minus the sum of (x) an adjustment for vacancy/collection losses equal to the greater of (i) five percent (5%), or (ii) the actual vacancy rate at the applicable Property; and (y) the Operating Expenses (defined below) for the period being measured; and (z) an amount for management expenses not less than the greater of (aa) three percent (3%) of the amount of Gross Rents and expense reimbursements reduced by any adjustment for vacancy/collection losses, or (bb) the actual management expenses of each Property as of the date of determination.

"Note" shall have the meaning ascribed to such term in Recital B hereof.

"OFAC" shall have the meaning ascribed to such term in <u>Section 6.17</u> hereof.

"OFAC Laws and Regulations" shall have the meaning ascribed to such term in <u>Section 6.17</u> hereof.

"Operating Agreements" shall mean, collectively, any covenants, restrictions or agreements of record relating to the construction, operation or use of any Property.

"Operating Budget" shall have the meaning ascribed to such term in <u>Section 10.6</u> hereof.

"Operating Expenses" means for purposes of calculating Net Operating Income all actual operating expenses and disbursements of every kind, nature or description actually paid or due and payable (and

ATX000026

accrued even if not payable in the case of real property taxes and insurance premiums) during or projected by Lender to be incurred for the period being measured, including, without limitation, those for leasing, management, operation, maintenance, repairs, annual taxes, bond assessments, ground lease payments, insurance, utilities and other annual expenses (but not tenant retrofit and lease commission costs) actually expended, on a cash basis.  Operating Expenses shall not include any interest or principal payments on the Loan or any allowance for depreciation nor shall it include asset management fees or other fees payable under the operating agreement of Borrower.  Operating Expenses shall not include any management expenses to the extent that such management expenses have already been deducted from Net Operating Income pursuant to the definition of Net Operating Income contained herein.

"Outstanding Principal Balance" means the then outstanding principal balance of the Loan.

"Participant" shall have the meaning ascribed to such term in Section 12.13 hereof.

"Patriot Act" shall have the meaning ascribed to such term in Section 6.17 hereof.

"Payment Date" shall have the meaning ascribed to such term in the Note.

"Permitted Operating Expenses" shall have the meaning ascribed to such term in Section 10.5(b) hereof.

"Person" means any individual, corporation, partnership, limited liability company, trust, unincorporated organization or other entity.

"Plans and Specifications" shall include all plans, maps, sketches diagrams, surveys, drawings, specifications or lists of materials or any changes or modifications thereof in connection with the Improvements, all of which shall have been delivered to and approved by Lender, as the same may be amended from time to time with the written consent of Lender in accordance with the terms of this Agreement.

"Prescribed Laws" shall have the meaning ascribed to such term in Section 6.18 hereof.

"Property" and "Properties" shall have the meaning ascribed to such term in Recital A hereof.

"Property Management Agreement" means, individually and collectively as the context may require, (i) any agreement for the management or leasing of the property, as the same may be modified, amended and/or supplemented from time to time as permitted pursuant to the terms hereof and the other Loan Documents or (ii) a Qualified Replacement Property Management Agreement if the agreement referenced in clause (i) is no longer in effect.

"Property Manager" means a property manager acceptable to Lender, the Replacement Property Manager (as defined in Section 9.15), or any other successor property manager for the applicable Property as expressly permitted pursuant to this Agreement.

"Purchase Agreement" means, collectively, that certain real estate purchase and sale agreement (b) dated as of July 2, 2018 between World Class Acquisitions, LLC, as predecessor-in-interest to Borrower, and AHC-SEAZEN ODH, LLC ("5th Seller"), as seller, as amended by that certain First Amendment dated as of August 1, 2018 between such parties and that certain Second Amendment of Purchase Agreement dated as of August 6, 2018 between such parties and that certain Third Amendment of Purchase Agreement dated as of September 14, 2018 between such parties with respect to the 5th Property; (b) dated as of February 21, 2018 between World Class Acquisitions, LLC, as predecessor-in-interest to Borrower, and

ATX000027

Noble Capital Servicing, LLC ("900 Cesar Chavez Seller"), as seller, as amended by that certain First Amendment dated as of April 23, 2018 between such parties, that certain Second Amendment of Purchase Agreement dated as of May 21, 2018 between such parties, and that certain Third Amendment dated as of June 22, 2018 between such parties, and that certain Fourth Amendment dated as of September 5, 2018 between such parties with respect to the 900 Cesar Chavez Property; (c) dated as of July 2, 2018 between World Class Acquisitions, LLC, as predecessor-in-interest to Borrower, and CCGL Partners, LLC ("905 Cesar Chavez Seller"), as seller, as amended by that certain First Amendment dated as of August 16, 2018 between such parties, and that certain Second Amendment of Purchase Agreement dated as of September 12, 2018 between such parties with respect to the 905 Cesar Chavez Property; (d) dated as of May 7, 2018 between World Class Acquisitions, LLC, as predecessor-in-interest to Borrower, and Alan A & Denise O Chamberlain ("7200 Congress Seller"), as seller, as amended by that certain First Amendment dated as of July 6, 2018 between such parties, that certain Second Amendment of Purchase Agreement dated as of July 13, 2018 between such parties, and that certain Third Amendment dated as of July 20, 2018 between such parties with respect to the 7200 Congress Property.

"Qualified Replacement Property Management Agreement" shall mean a leasing and management agreement with a Qualified Replacement Property Manager, which leasing and management agreement shall be acceptable to Lender in form and substance (such approval to be granted or withheld in Lender's sole and absolute discretion).

"Qualified Replacement Property Manager" means a reputable and experienced property management organization/leasing agency possessing experience in managing and leasing properties similar in size, scope, use and value as the Properties, as approved by Lender in its sole discretion.

"Rating Agency" means a nationally recognized organization that assesses and issues opinions regarding the relative credit quality of bond issues.

"Real Property" shall have the meaning ascribed to such term in Recital A hereof.

"Required Work" shall have the meaning ascribed to such term in Section 2.3(e).

"Reserves" means, collectively, any reserves established under the Loan Documents.

"Secondary Market Transaction" means (1) any sale of the Security Instrument, this Agreement, the Note and other Loan Documents to one or more investors as a whole loan, (2) a participation of the Loan or Borrower's obligations under the Loan to one or more investors, (3) a securitization of the Loan, (4) a pledge of the Loan, the Security Instrument, this Agreement, the Note and/or the other Loan Documents, and/or (5) any other sale, pledge, hypothecation, participation, encumbrance or transfer of the Loan or Borrower's obligations under the Loan or any interest therein to one or more investors.

"Security Instrument" shall have the meaning ascribed to such term in Recital C hereof.

"Seller" means, collectively, (a) 5th Seller with respect to the 5th Property; (b) 900 Cesar Chavez Seller with respect to the 900 Cesar Chavez Property; (c) 905 Cesar Chavez Seller with respect to the 905 Cesar Chavez Property; and (d) 7200 Congress Seller with respect to the 7200 Congress Property.

"Structural Engineering Report" shall have the meaning given to such term in Section 3.1.1(h) hereof.

"Subdivision Map" shall have the meaning ascribed to such term in Section 9.5 hereof.

"Survey" shall have the meaning ascribed to such term in Section 3.1.1(k) hereof.

ATX000028

"Tax and Insurance Reserve" shall have the meaning ascribed to such term in Section 2.4(a) hereof.

"Title Company" means Fidelity Title Company, and its agents.

"Title Policy" means an TLTA extended coverage lender's title policy issued by Title Company insuring the lien of the Security Instrument in the full maximum principal amount of the Loan subject only to such exceptions approved by Lender and including such endorsements as are required by Lender.

"Transfer" means the sale, transfer, hypothecation, encumbrance, mortgage, conveyance, lease, alienation, assignment, pledge, disposition, divestment, or leasing with option to purchase, or assignment of any Property, or any portion thereof or interest therein (whether direct or indirect, legal or equitable, including the issuance, sale, assignment, pledge, alienation, conveyance, divestment, transfer, disposition, hypothecation, mortgage or encumbrance of any direct or indirect ownership interest in Borrower or in any entity having an ownership interest in Borrower, whether direct or indirect) (or entering into any agreement or contract to do any of the foregoing that is not conditioned on compliance with the terms of the Loan Documents), or undertaking, suffering or causing any of the foregoing to occur voluntarily, involuntarily or by operation of law.

"UCC Searches" shall have the meaning ascribed to such term in Section 3.1.1(t).

## ARTICLE 2.LOAN

2.1     **LOAN**.  By and subject to the terms of this Agreement, Lender agrees to lend to Borrower and Borrower agrees to borrow from Lender the principal sum of TWENTY TWO MILLION NINE HUNDRED THIRTY TWO THOUSAND TWO HUNDRED FIFTY AND NO/100 DOLLARS ($22,932,250.00), said sum to be evidenced by the Note.  The Note shall be secured, in part by, among other things, the Security Instrument encumbering each Property.  Amounts disbursed to or on behalf of Borrower pursuant to the Note shall be used to acquire the Properties and Improvements and for such other purposes and uses as may be permitted under this Agreement and the other Loan Documents.

2.2     **MATURITY DATE**.  On the Maturity Date, all sums due and owing under this Agreement and the other Loan Documents shall be repaid in full.  All payments due to Lender under this Agreement, whether at the Maturity Date or otherwise, shall be paid in immediately available funds.

2.3     **FUNDING OF LOAN**.

(a)     Initial Funding Aggregate Amount.  Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, including, without limitation, satisfaction of the conditions precedent set forth in Section 3.1.1 hereof, on the Effective Date, Borrower agrees to borrow from Lender, and Lender shall disburse to Borrower from the proceeds of the Loan the sum of Sixteen Million Eight Hundred Thirty Two Thousand Two Hundred Fifty and No/100 Dollars ($16,832,250.00) (the "Initial Funding Amount").  The Initial Funding Amount shall be used for paying (A) a portion of the purchase price payable by Borrower to Seller for the Properties pursuant to the Purchase Agreement, (B) out-of-pocket fees, costs and expenses incurred by Lender in connection with the Loan transaction, including, without limitation, all appraisal, title, escrow, engineering, environmental and attorneys' fees and expenses (collectively, the "Lender Expenses"), (C) the Loan Commitment Fee and (D) establishment of the Tax and Insurance Reserve.  Borrower hereby authorizes Lender to disburse on the Effective Date such Loan proceeds directly to Lender as are necessary to pay the Lender Expenses and the Loan Commitment Fee so long as such expenses are memorialized on a closing statement acknowledged by both Borrower and Lender.

ATX000029

(b)    Future Advances.  Six Million One Hundred Thousand and No/100 Dollars ($6,100,000.00) of the Loan shall not be released to Borrower on the Effective Date (the "Future Advance Funding Amount").  Subject to the terms, provisions and conditions of this Agreement and the other Loan Documents, subsequent to the Effective Date, Lender shall disburse to Borrower the Future Advance Funding Amount as provided in this Section 2.3(b), and upon disbursement, such disbursements shall be added to the principal balance of the Note.  The Future Advance Funding Amount shall be used for the following purposes:

(A)    Interest Holdback.

(1)    One Million Three Hundred Fifty Thousand and No/100 Dollars ($1,350,000.00) of the Future Advance Funding Amount shall not be released to Borrower or deemed to be advanced on the Effective Date and shall be made available as a holdback for interest payments under the Loan (the "Interest Holdback") and shall be disbursed pursuant to the terms and conditions of this Section 2.3 and Section 3.1.2.

(2)    So long as a Default has not occurred and there are sufficient funds available in the Interest Holdback, the Interest Holdback shall be periodically disbursed directly by Lender to Lender in accordance with the Loan Documents for the payment of interest which accrues and becomes due under the Note solely to the extent Net Operating Income is not sufficient to pay the same.  The funds in such Interest Holdback shall, for purposes of interest calculation, be deemed disbursed to Borrower as of the date applied by Lender to interest outstanding under the Note.

(3)    If at any time there is an Interest Reserve Deficiency, Borrower shall, within ten (10) Business Days after written notice by Lender, deposit with Lender (or into a Reserve established by Lender) the amount of the Interest Reserve Deficiency.  Such deposit by Borrower shall be derived from additional Borrower Equity and shall not come from Loan proceeds or otherwise be borrowed.

(4)    Lender is hereby authorized to charge the Loan directly for such interest payments when due by reducing the amount in the Interest Holdback.  If Lender disburses funds to Lender directly from the Interest Holdback, Lender shall provide Borrower with a monthly interest statement.  Depletion of the Interest Holdback shall not release Borrower from any of Borrower's obligations under the Loan Documents including, without limitation, payment of all accrued and due interest.  Lender shall have no obligation to release any portion of the Interest Holdback during any period that a Default or an Event of Default exists.

(B)    [Omitted].

(C)    Capital Holdback.

(1)    Four Million Seven Hundred Fifty Thousand and No/100 Dollars ($4,750,000.00) of the Future Advance Funding Amount shall not be released to Borrower or deemed to be advanced on the Effective Date but shall be made available for the payment of the costs and expenses of renovating and/or constructing the Improvements, as the case may be, in accordance with the budgeted capital expenditures to the applicable Property and in all cases as permitted under this Agreement and the other Loan Documents and as specified in the Capital Improvement Budget attached hereto as part of Exhibit C (the "Capital Holdback").  Amounts in the Capital Holdback shall be made available on the terms and conditions contained herein (including the conditions contained in Section 3.1.2 hereof).

ATX000030

(D)      On or after the Effective Date, Lender may sell, assign or transfer (including through a participation) a portion of its interest in the Loan, including the entire obligation to fund the Future Advance Funding Amount pursuant to this <u>Section 2.3</u> (the "Funding Obligations"), to one or more parties (the "Funding Parties") in which case Lender shall have no further obligation for the Funding Obligations provided the Funding Parties assume such Funding Obligations in a manner directly enforceable by Borrower and such assumption is delivered in writing to Borrower.  The Funding Parties may assign, transfer or sell all or any portion of its Funding Obligations, and shall thereafter be relieved of such Funding Obligation provided that such assignee assumes such Funding Obligation in writing in a manner directly enforceable by Borrower and such assumption is delivered in writing to Borrower.  No failure to fund such Funding Obligations by the Funding Parties or by such assignee, transferee or purchaser shall result in any offset, defense or counterclaim to the payment of the Loan or to the enforcement of any rights of Lender under the Loan Documents, and Borrower's sole remedy shall be a suit for actual damages (as opposed to consequential, punitive or exemplary damages) against such non-funding assignee, transferee or purchaser.  After any such sale, assignment or transfer, Lender shall have no Funding Obligations hereunder.

(c)      <u>Disbursement Requests Subsequent to Effective Date from Holdbacks and Reserve Accounts</u>.  Without limitations on other restrictions on funding contained in this <u>Section 2.3</u> or <u>Section 3.1.2</u>, other than disbursements from the Interest Holdback or Tax and Insurance Reserve, there shall not be more than one (1) disbursement in any calendar month from any one Holdback and Reserves under this <u>Section 2.3</u> and any such disbursements (other than disbursements from the Interest Holdback or Tax and Insurance Reserve) must be in the minimum amount of at least the lesser of (x) Fifty Thousand Dollars ($50,000) and (y) the remaining balance in such Holdback or Reserve.  In addition, in connection with any such disbursement, Borrower shall give to Lender, at 11755 Wilshire Boulevard, Suite 1425, Los Angeles, California 90025, Attention: Simond Lavian or at such other address as Lender shall designate, an original or facsimile written request for disbursement in the form of <u>Exhibit E</u> attached hereto or such other form as is required by Lender in its sole discretion (together with all supporting documents and information required by Lender for draws), no later than 2:00 p.m. Eastern Standard Time or Eastern Daylight Time, as applicable, and not less than ten (10) Business Days prior to the proposed funding date of such disbursement.  Each such request for disbursement shall specify (i) Borrower's desired funding date (which shall be a Business Day) in respect of the disbursement of proceeds from a Holdback or a Reserve, (ii) the amount of the proposed disbursement, (iii) the proposed use of such disbursement of Holdback and Reserve proceeds, (iv) a certification that each of the conditions to Lender's obligation to fund the Holdback and Reserve proceeds as set forth herein have been satisfied, and (v) shall be accompanied by such additional documents and information relating to the proposed disbursement as Lender shall reasonably require.  Subject to Lender's approval of the request for disbursement, which shall be in Lender's reasonable discretion, and in accordance with the terms and conditions contained in this Agreement, Lender shall use good faith efforts to make available to Borrower the proceeds of each disbursement requested by Borrower on the funding date specified in the Borrower's request for disbursement (or such other date as Lender shall deem appropriate) and shall disburse such funds into such account of Borrower as Borrower shall specify and Lender shall approve.  Each such request for a disbursement from the Capital Holdback shall be accompanied by an administrative fee in the amount of Five Hundred and No/100 Dollars ($500.00) per draw.

(d)      <u>General Provisions Relating to Holdbacks and Reserves</u>.  Funds in the Holdbacks and Reserves shall be used only for the purposes and pursuant to line item limitations set forth in the Approved Budget (subject to adjustment as provided in <u>Section 10.6</u> hereof), or as otherwise set forth in this Agreement.  Funds in each of the Reserves may be commingled with other funds of Lender (or its servicer, if applicable).  Borrower grants to Lender a first priority security interest in all funds on deposit in the Reserves to secure Borrower's obligations under the Loan Documents.  If an Event of Default shall

ATX000031

occur hereunder or under any of the other Loan Documents, Lender may, without notice or demand on Borrower or any Affiliates of Borrower, at its option: (i) withdraw any or all of the funds (including, without limitation, interest) then remaining in the Reserves and apply the same, after deducting all costs and expenses of safekeeping, collection and delivery (including, but not limited to, reasonable attorneys' fees, costs and expenses) to the Loan or any other obligations of Borrower under the other Loan Documents in such manner as Lender shall deem appropriate in its sole discretion, (ii) exercise any and all rights and remedies of a secured party under any applicable Uniform Commercial Code, including, without limitation, those with respect to the Reserves and/or (iii) exercise any other remedies available at law or in equity. Borrower shall execute any and all documents or agreements, and take such actions, as Lender in its good faith deems necessary or advisable to ensure that Lender shall at all times retain a first-priority perfected security interest in each of the Reserves. Lender shall have no obligation to advance funds from any of the Reserves if a Default or an Event of Default exists. Without limitation, Lender shall have no obligation to (a) advance any funds from any of the Holdbacks or from any of the Reserves within ninety (90) days of the then-existing Maturity Date or (b) reimburse Borrower from any Holdbacks or Reserves for projects or other works of improvement that Lender determines may not be completed within ninety (90) days of the then-existing Maturity Date. The funds in the Holdbacks shall, for purposes of interest calculation, be deemed disbursed to Borrower as of the date disbursed by Lender (whether to Borrower or third parties). Lender may (but shall not be obligated to) cause funds in the Reserves (other than the Tax and Insurance Reserve) to be deposited into interest bearing accounts of the type customarily maintained by Lender or its servicing agent for the investment of similar reserves, which accounts may not yield the highest interest rate then available. Interest payable on such amounts shall be computed based on the daily outstanding balance of the applicable Reserve (other than the Tax and Insurance Reserve), such interest shall be retained by Lender and accumulated for the benefit of Borrower and added to the balance in the applicable Reserve (other than the Tax and Insurance Reserve) and shall be disbursed for payment of the items for which other funds in the applicable Reserve are to be disbursed.

        (e)    Required Work. Any improvements required to be performed under this Agreement or paid for under this Agreement ("Required Work") (including, without limitation, all work required under Section 9.12 hereof and all work paid for or required to be performed under or funded from any Holdback or a Reserve) shall be completed in a lien-free and good and workmanlike manner as soon as practicable in substantial accordance with the Approved Plans and Specifications and in strict compliance with the terms of any applicable Lease. Without limitation, all work to be all Required Work shall comply with all applicable laws, ordinances, rules and regulations of all Governmental Authorities having jurisdiction over each applicable Property and applicable insurance requirements, including applicable building codes, special use permits, environmental regulations, and requirements of insurance underwriters. Borrower agrees that all materials contracted or purchased for construction of each applicable Property and all labor hired or contracted for with respect to any construction and paid for with proceeds of the Loan will be used and employed solely on each applicable Property and for no other purpose. Without limitation of the foregoing, Borrower shall cause all of the capital improvement work (as shown on the Approved Budget (if any)) to be completed pursuant to the terms herein within the time frames set forth in Exhibit C attached hereto (if any). Failure to timely complete each such work (if any) shall constitute an Event of Default.

        (f)    Termination Payments. Any of the following items received by Borrower shall be delivered to Lender or deposited into a Reserve established and/or designated by Lender: (i) lease rejection, termination, surrender or cancellation payments (including in any bankruptcy case) or lease buy-out or surrender payments from any tenant (including any payment relating to unamortized tenant improvements and/or leasing commissions), forfeited security deposits, proceeds from letters of credits or similar payoffs received by Borrower, (ii) any settlements of claims of Borrower against third parties in connection with any Lease, (iii) any holdover rents or use and occupancy fees from any tenant or former tenant (to the extent not being paid for use and occupancy or holdover rent) and (iv) any other extraordinary event pursuant to which Borrower receives payments or income derived from or generated by the use, ownership or operation

ATX000032

of each Property not otherwise covered by this Agreement or the other Loan Documents shall be deposited into the Reserve designated by Lender.

    2.4    **ADDITIONAL RESERVES**.

    (a)    <u>Tax and Insurance Impounds</u>.  Tax and insurance reserves shall be maintained by a monthly deposit (on each Payment Date (as defined in the Note)) by Borrower of one-twelfth (1/12th) of the annual real property taxes and assessments for each Property and one-twelfth (1/12th) of the annual insurance premiums payable for each Property, each as reasonably estimated by Lender (the "Tax and Insurance Reserve").  Notwithstanding the foregoing, on the Effective Date, the Tax and Insurance Reserve shall be funded in an amount which, when the required monthly payments are added thereto, will be sufficient to pay such charges when due.  Borrower shall provide to Lender a copy of the applicable invoices at least ten (10) Business Days prior to when due.  If Lender at any time determines that any amounts paid into the Tax and Insurance Reserve are insufficient for the payment in full of such taxes, assessments, levies and/or insurance premiums, Lender shall notify Borrower of the increased amounts required to pay all amounts due, whereupon Borrower shall pay (or cause to be paid) to Lender within ten (10) Business Days thereafter the additional amount as stated in Lender's notice.

    So long as no Default or Event of Default has occurred and is continuing, all sums in the Tax and Insurance Reserve shall be held by Lender in the Tax and Insurance Reserve to pay annual real property taxes and assessments for each Property when necessary so that the maximum tax discount available may be obtained with regard to each Property and to pay insurance premiums for each Property in one installment before the same become delinquent.  Borrower shall be responsible for ensuring the receipt by Lender, at least thirty (30) days prior to the respective due date for payment thereof, of all bills, invoices and statements for all real property taxes and assessments and insurance premiums to be paid from the Tax and Insurance Reserve, and, so long as no Event of Default hereunder or under any other Loan Document has occurred and is continuing, Lender shall pay the governmental authority or other party entitled thereto directly, to the extent funds are available for such purpose in the Tax and Insurance Reserve.  In making any payment from the Tax and Insurance Reserve, Lender shall be entitled to rely on any bill, statement or estimate procured from any public office or insurance company or agent without any inquiry into the accuracy of such bill, statement or estimate and without any inquiry into the accuracy, validity, enforceability or contestability of any tax, assessment, valuation, sale, forfeiture, tax lien or title or claim thereof.  The Tax and Insurance Reserve shall not, unless otherwise explicitly required by applicable law, be or be deemed to be escrow or trust funds, but, at Lender's option and in Lender's discretion, may either be held in a separate account or be commingled by Lender with the general funds of Lender or Lender's loan servicer.  Interest (if any) on the funds contained in the Tax and Insurance Reserve shall accrue for the benefit of and belong to Lender and shall be paid immediately to Lender.  No interest on funds contained in the Tax and Insurance Reserve shall be paid by Lender to Borrower.  The Tax and Insurance Reserve is solely for the protection of Lender and entails no responsibility on Lender's part beyond the payment of taxes, assessments and insurance premiums following receipt of bills, invoices or statements therefor in accordance with the terms hereof and beyond the allowing of due credit for the sums actually received.  Upon assignment of the Loan by Lender, any funds in the Tax and Insurance Reserve shall be turned over to the assignee and any responsibility of Lender, as assignor, with respect thereto shall terminate.  If the total funds in the Tax and Insurance Reserve shall exceed the amount of payments actually applied by Lender for the purposes of the Tax and Insurance Reserve, such excess shall, at the option of Lender, either be credited by Lender on subsequent payments to be made hereunder or refunded to Borrower.  If, however, the Tax and Insurance Reserve shall not contain sufficient funds to pay the sums required when the same shall become due and payable, Borrower shall, within ten (10) days after receipt of written notice thereof, deposit with Lender the full amount of any such deficiency.  If Borrower shall fail to deposit with Lender the full amount of such deficiency as provided above, such failure shall constitute an Event of Default and, without limiting Lender's other rights and remedies by reason thereof, Lender shall have the option, but not

the obligation, to make such deposit and all amounts so deposited by Lender, together with interest thereon at the Default Interest Rate from the date deposited by Lender until actually paid by Borrower, shall be immediately paid by Borrower on demand and shall be secured by the Security Instrument and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  If there is an Event of Default, Lender may, but shall not be obligated to, to the extent permitted by law, apply at any time the balance then remaining in the Tax and Insurance Reserve against the indebtedness secured by the Security Instrument in whatever order Lender shall subjectively determine.  No such application of the Tax and Insurance Reserve shall be deemed to cure any Default or Event of Default hereunder.  Upon full payment of the indebtedness secured hereby in accordance with its terms or at such earlier time as Lender may elect, the balance of the Tax and Insurance Reserve then in Lender's possession shall be paid over to Borrower and no other party shall have any right or claim thereto.

### 2.5    DISTRIBUTION OF CASH FLOW.

(a)    Provided that no Event of Default has occurred and is continuing, Borrower shall cause all Gross Operating Income to be applied on a monthly basis for the following purposes and in the following order of priority:

(i)    First, to establish and fund the Tax and Insurance Reserve;

(ii)    Next, the balance, if any, to Lender to make the monthly interest payments due and payable on the Loan;

(iii)    Next, the balance, if any, to establish and fund any other Reserves to be funded by Borrower hereunder;

(iv)    Next, the balance, if any, to Lender for the payment of any other amounts then due and payable under the Loan Documents;

(v)    Next, the balance, if any, to the payment of the Permitted Operating Expenses; and

(vi)    Finally, the balance, if any, to Borrower in accordance with the Loan Documents.

SUBJECT TO THE PROVISIONS OF SECTION 3 OF THE NOTE, IN THE EVENT THAT GROSS OPERATING INCOME SHALL NOT BE SUFFICIENT TO ENABLE BORROWER TO MAKE ANY OF THE PAYMENTS DESCRIBED IN SUBPARAGRAPHS (i) THROUGH (v) ABOVE, BORROWER SHALL NOT BE RELIEVED OF ITS OBLIGATIONS TO MAKE SUCH PAYMENTS.

(b)    Notwithstanding the foregoing, upon the occurrence of an Event of Default, Borrower shall have no right to apply Gross Operating Income for any purpose without Lender's prior written approval, and Lender shall have all of the remedies available to it pursuant to this Agreement, the other Loan Documents and Applicable Laws.

ATX000034

## ARTICLE 3.
## DISBURSEMENT

**3.1**     <u>**CONDITIONS PRECEDENT TO DISBURSEMENTS**</u>.

    3.1.1     Lender's obligation to make the initial disbursement under the Loan Documents shall be subject to satisfaction of the following conditions precedent by not later than the date hereof:

    (a)     <u>No Default or Event of Default</u>. There exists no Default or Event of Default.

    (b)     <u>Loan Documents</u>. Lender shall have received all Loan Documents, other documents, instruments, policies, and forms of evidence or other materials requested by Lender under the terms of this Agreement or any of the other Loan Documents.

    (c)     <u>Security Instrument</u>. The Security Instrument is a valid lien upon each Property and is prior and superior to all other liens and encumbrances thereon except those approved by Lender in writing.

    (d)     <u>Representations and Warranties True at Closing</u>. The representations and warranties contained in <u>Article 6</u> of this Agreement or otherwise made by or on behalf of Borrower in any of the Loan Documents or in any certificate, written statement or other writing given in connection with the Loan (including, but not limited to, all financial and operating statements) shall be true and correct in all material respects on and as of the Effective Date with the same effect as if made at such time.

    (e)     <u>Performance</u>. Borrower shall have performed and complied with all agreements and conditions contained herein required to be performed and complied with by Borrower prior to or on the Effective Date.

    (f)     <u>Reports, Studies and Permits</u>. Lender shall have received and approved in form and substance reasonably satisfactory to Lender: (i) a report of the physical condition of each Property; (ii) copies of all agreements which were material to completion of the Improvements; (iii) copies of all building permits and similar permits, licenses, approvals, zoning and land use approval, development agreements and other authorizations of governmental agencies, if any, required in connection with the development of each Property; and (iv) copies of any initial study, negative declaration, mitigated negative declaration, environmental impact report, notice of determination or notice of exemption prepared, adopted, certified or filed by or with any governmental agency in connection with each Property.

    (g)     <u>Environmental Matters</u>. Lender shall have received the Environmental Report in form and substance reasonably satisfactory to Lender from an independent, licensed environmental engineer approved by Lender, certifying to Lender that each Property is free from any Hazardous Substances, except for such uses which are in compliance with Environmental Laws. Such report shall be addressed directly to Lender or, if such report is not addressed to Lender, Borrower shall obtain reliance letters satisfactory to Lender.

    (h)     <u>Structural Engineering Report</u>. Lender shall have received and approved from an independent, licensed engineer reasonably acceptable to Lender, a report (the "Structural Engineering Report") certifying to Lender that each Property is structurally sound and is in good order and repair, identifying, among other things, any deferred maintenance for each Property and the cost thereof, providing a 10-year schedule of anticipated capital expenditures and the per annum costs thereof, and setting forth recommendations of remedial repairs, capital improvements and replacements which should be undertaken.

(i)     Earthquake Report.  To the extent required by Lender, Lender shall have received and approved from an independent, licensed engineer reasonably acceptable to Lender, a report stating the probable maximum loss to each Property resulting from seismic events.  The report shall include, but shall not be limited to, a soil analysis, structural analysis, and soil-structure interaction analysis, proximity to known faults and seismic history.

(j)     Title Insurance.  The Title Company shall be irrevocably committed to issue to Lender the Title Policy which shall include extended coverage policies of title insurance, together with such endorsements as required by Lender, in the amount of the Loan (or other amount approved by Lender) and issued by Title Company, with such reinsurance or co-insurance as may be required by Lender, in form and substance satisfactory to Lender insuring that Borrower is the owner of each Property, and that the Security Instrument creating the insurable interest of Lender under the Title Policy is a valid first lien on each Property encumbered thereby, in favor of Lender, its successors and assigns, as the insured, free and clear of all liens, encumbrances and exceptions to title whatsoever, other than encumbrances approved in writing by Lender prior to the Effective Date.

(k)     Survey.  Borrower shall have furnished to Lender two (2) copies of an acceptable survey by an independent, registered surveyor reasonably satisfactory to Lender, certified to Lender, its successors and assigns, and the Title Company as correct and as having been made in accordance with the most recent standards for "Minimum Standard Detail Requirements for ALTA/ACSM Land Title Surveys," jointly established and adopted by ALTA and ACSM (the "Survey").

(l)     Insurance.  Borrower shall have delivered to Lender the policies of insurance (or certificates) as required by Article 5 of this Agreement, and shall have delivered evidence reasonably satisfactory to Lender of the payment of all premiums payable for the existing period of such policies.

(m)     Consents, Licenses, Permits and Approvals.  Borrower shall have furnished to Lender copies of, or other evidence satisfactory to Lender establishing that Borrower has obtained, all consents, licenses, permits and approvals from any and all governmental authorities having jurisdiction over Borrower and/or any Property, which are required in connection with each Property and the Improvements and/or the execution, delivery and performance by Borrower under, and the validity and enforceability of, the Loan Documents, and all such consents, licenses, permits and approvals shall be in full force and effect, and written proof that any and all corporate, partnership and limited liability company action necessary to enable Borrower to enter into the financing transactions contemplated by this Agreement shall have been obtained and/or taken by Borrower (including, without limitation, any required consents of any partners, members and/or shareholders).

(n)     REAs, CCRs.  Lender shall have received copies of any reciprocal easement agreements, development agreements, covenants, conditions and restrictions or similar agreements affecting each Property and each and all of the same shall be reasonably satisfactory in form and substance to Lender.

(o)     Financial Statements.  Lender shall have received originally signed and dated financial statements, balance sheets, and tax returns from Borrower, and each Guarantor, and any other financial information relating to each Property requested by Lender, including, without limitation, income and expense statements.

(p)     Payment of Fees and Expenses.  Borrower shall have paid to Lender, on or before the Effective Date, the Loan Commitment Fee and the Lender Expenses.

(q)      Leases and Tenant Estoppels.  Borrower shall have provided Lender with (i) copies of any signed Leases and any amendments and lease guarantees each the Property; (ii) [intentionally omitted]; (iii) if applicable, a current itemized and certified rent roll for each Property; and (iv) if applicable, a tenant estoppel certificate, which at Borrower's election, may be delivered within thirty (30) days of the Effective Date) and subordination and non-disturbance agreement executed by all tenants of Major Leases of each Property, in each case respecting the underlying lease related thereto, in form, substance and scope satisfactory to Lender in its sole discretion (in which, without limiting the generality of the foregoing, the applicable tenant shall certify, represent and warrant to Lender that, among other things, each such Lease is in effect in accordance with its terms, and that there are no existing defaults under any of the Leases).

(r)      Lien Search Reports.  Lender shall have received satisfactory reports of UCC, federal tax lien, state tax lien, bankruptcy, judgment and pending litigation searches conducted by a search firm reasonably acceptable to Lender (collectively, the "UCC Searches").  Such UCC Searches shall have been received in relation to Borrower and Guarantor.

(s)      No Injunction.  No law or regulation shall have been adopted, no order, judgment or decree of any Governmental Authority shall have been issued, and no litigation shall be pending or threatened, which in the good faith judgment of Lender would enjoin, prohibit or restrain, or impose or result in an adverse effect upon the making or repayment of the Loan or the consummation of the transactions contemplated by the Loan Documents.

(t)      Material Contracts.  Borrower shall have delivered to Lender a copy of any Material Agreements and Operating Agreements relating to each Property, including without limitation, the Property Management Agreement.  In addition, if required by Lender, Borrower shall obtain estoppels and other customary agreements with any third parties under such Material Agreements and Operating Agreements.

(u)      Site Inspection.  Lender shall have performed, or caused to be performed on its behalf, an on-site due diligence review of each Property satisfactory to Lender in Lender's sole discretion.

(v)      Subdivision.  Lender shall have received evidence satisfactory to Lender (including title endorsements) that the Real Property comprising each Property constitutes a separate lot for real estate tax and assessment purposes.

(w)      No Material Adverse Change.  Since the date financial reports were delivered to Lender, there shall have been no material adverse change in the financial condition or business of Borrower or Guarantor nor any material decline in the condition or market value of each Property, each as determined by Lender in its sole discretion.

(x)      Underwriting and Due Diligence.  Lender shall have satisfactorily completed its underwriting and due diligence with respect to the Loan, Borrower, the partners, joint venturers or members of Borrower, each Guarantor, and each Property, including, without limitation, any title, survey, insurance, tenant estoppel letters, lease abstracts, environmental reports, structural reports, and financial statements relating to each Property, and Lender shall have completed such other real estate and legal due diligence investigations as Lender deems necessary, and such review and investigations shall provide Lender with resulting information which, in Lender's sole discretion, is satisfactory to permit Lender to enter into this Agreement and to make the Loan.

(y)      Budgets.  Lender shall have reviewed and approved capital improvement and operating budgets for each Property, and Borrower's proposed sources and uses of funds for the Loan

proceeds, together with a detailed timeline for completion of the capital improvements or renovations (if any) contemplated for each Property.

(z)     Affiliate Fees.  Borrower shall have disclosed to Lender, and Lender shall have approved, all fees, commissions and other amounts (collectively, "Affiliate Fees") which have been or will be reimbursed or paid to or paid on behalf of Borrower, any Guarantor or any Affiliate thereof in connection with the acquisition or financing of each Property, including, without limitation, amounts paid by the Seller or any affiliate of the Seller.  All Affiliate Fees shall be deducted from the calculation of the capitalization costs of the financing transaction contemplated by this Agreement for determining the maximum principal amount of the Loan and Borrower's required equity contribution.  Without limitation on the foregoing, all Affiliate Fees shall be subordinate to the Loan and shall be terminable by Lender in the event of the occurrence of an Event of Default.

(aa)     Borrower Equity.  Borrower shall have caused (and Borrower hereby agrees to cause) the Borrower Equity to be applied to the costs of closing of the loan and payment of Borrower's costs and expenses of acquiring the Properties, consisting of the purchase price for each Property payable by Borrower to Seller pursuant to the Purchase Agreement.

(bb)     The Property is not being used for the production, distribution or sale of marijuana, cannabis or their byproducts or any pharmaceutical or other drug and, no Tenant is permitted to use the Property for such purposes and, to Borrower's knowledge, no Tenant is using the Property for such purpose.

(cc)     Charter Documents.  Lender shall have received from Borrower and Guarantor, certified copies of all organizational documents relating to such Person (other than a natural Person) as Lender may request, including, but not limited to, all partnership or operating agreements evidencing the organization, existence and authority of Borrower and such other corporate, partnership and limited liability company documents with respect to Borrower and its constituent entities as Lender shall require, including evidence of authorization and incumbency of all Persons executing the Loan Documents on behalf of Borrower, good standing certificates, qualifications to do business in the appropriate jurisdictions, resolutions authorizing the execution, delivery and performance of the Loan Documents, and incumbency certificates.

(dd)     Additional Matters.  Lender shall have received such other permits, certificates (including certificates of occupancy reflecting the use of each Property as of the Effective Date), opinions, documents and instruments (including without limitation, written proof from the appropriate Governmental Authority regarding the zoning of each Property) in form and substance reasonably acceptable to Lender relating to the Loan as may have been requested by Lender and all other documents and all legal matters in connection with the Loan shall be reasonably satisfactory in form and substance to Lender.

3.1.2     The obligation of Lender to make any disbursement under the Loan of all or a portion of Future Advance Funding Amount or any Reserves hereunder (including the Reserves under Section 2.4) is subject to the satisfaction of the following additional conditions precedent as of the date of any such disbursement:

(a)     Disbursement Request.  Lender shall have received a written request for disbursement submitted in accordance with Section 2.3 of this Agreement, which shall provide a detailed description of the uses of the proceeds of such disbursement;

(b)     Use of Proceeds; Disbursement Schedule.  The proceeds of the disbursement are solely for uses permitted under this Agreement including the disbursement schedule contained in the

ATX000038

approved any Capital Improvement Budget and/or the Approved Budget; and Borrower shall have satisfied any other specific conditions herein for use of the Loan proceeds to be disbursed to Borrower;

(c)      <u>In-Balance</u>.   The Loan is In-Balance pursuant to the terms of <u>Section 9.13</u> hereinbelow;

(d)       <u>Representations and Warranties</u>.  All of the representations and warranties of Borrower contained in this Agreement or in any other Loan Document shall be true and correct in all material respects as though made on and as of such date;

(e)      <u>No Event of Default</u>.  No Default or Event of Default shall have occurred and be continuing or would result from the making of such disbursement;

(f)      <u>Application of Gross Operating Income</u>.  Borrower shall have applied all Gross Operating Income in accordance with the <u>Section 2.5</u> hereof and shall provide evidence reasonably satisfactory to Lender evidencing such application;

(g)      <u>No Material Adverse Change</u>.  No change shall have occurred in Borrower, any Property or any other Collateral which has a material adverse effect upon the value of the Collateral or the right or ability of Lender to receive payment in full of all amounts payable by Borrower to Lender under this Agreement or the other Loan Documents;

(h)      <u>Title Policy</u>.  The lien of the Security Instrument shall continue to be insured by the Title Policy as a senior priority lien against each Property and Lender shall receive any endorsements to the Title Policy required by Lender in connection therewith (including any endorsement required to increase the amount of coverage to reflect such disbursement);

(i)      <u>Affirmation</u>.  If required by Lender, each Guarantor shall have reaffirmed in writing to Lender all of its obligations under the Guaranty;

(j)      <u>Fees and Costs</u>.  All out-of-pocket fees and expenses payable to Lender (or other fees and expenses due and payable hereunder), to the extent then due and payable, shall have been (or contemporaneously are being) paid in full and all title premiums and other title and survey charges shall have been (or contemporaneously are being) paid in full;

(k)      <u>Additional Requirements for Payments from Certain Holdbacks</u>.  In connection with reimbursements to be made from the Capital Holdback the following additional terms and conditions shall apply:

i.      Without limitation on other requirements, Lender may require that Borrower shall furnish to Lender, separately with respect to each such request, AIA forms G702 and G703 (or acceptable equivalents) and such other forms and schedules of values as may from time to time be approved or required by Lender, duly signed and sworn to by Borrower and each applicable contractor, with all blanks appropriately completed, setting forth such details concerning construction of the improvements as Lender shall require.  If required by Lender, Borrower shall have furnished to Lender evidence that all required inspections by governmental authorities have been satisfactorily completed.

ii.      If required by Lender, Borrower shall have submitted and Lender shall have approved in writing (A) the improvements to be constructed and the estimated cost thereof, (B) the   plans and specifications for such improvements (in which event such plans and

specifications shall be included as "Approved Plans and Specifications"), which Approved Plans and Specifications may not be changed without Lender's prior written consent, and (C) if requested by Lender, each contract or subcontract for an amount in excess of Twenty-Five Thousand and No/100 Dollars ($25,000.00) for the performance of labor or the furnishing of materials for such improvements.  Upon Lender's request, Borrower shall assign any such contract or subcontract to Lender.  All work for which amounts shall be disbursed shall be under GMAX contracts.

iii.      All work performed by Borrower prior to the date a payment or reimbursement is requested shall be completed or progressing to the satisfaction of Lender (and/or its agents) and Lender's engineer and substantially in accordance with any applicable Approved Plans and Specifications and applicable budget for such improvements, and Applicable Laws.

iv.      Borrower shall not use any portion of any disbursement for payment of any other cost except as specifically set forth in a request for payment or reimbursement approved by Lender in writing or as properly reallocated by Borrower pursuant to this Agreement.

v.      No funds will be used to pay or reimburse Borrower for payment for materials stored at any Property unless Borrower furnishes Lender evidence, satisfactory to Lender, that such materials are properly stored and secured at the applicable Property.

vi.      Borrower shall have provided to Lender evidence satisfactory to Lender (including access to each Property to Lender and any agent of Lender for the purpose of an inspection of work done, at Borrower's expense, if requested by Lender) that the construction covered by the request for payment or reimbursement has been performed and the applicable materials have been furnished.  Unless a Default has occurred and is continuing, only one (1) inspection per month pursuant to this Section 3.12(k)(vi) shall be at Borrower's expense.

vii.      If required by Lender, Borrower shall have furnished to Lender a list of the names and addresses of all mechanics and materialmen who have performed labor or supplied materials the cost of which is to be paid from the disbursement of proceeds that is the subject of the improvements payment or reimbursement request.

viii.      Disbursement for hard costs shall be limited to the lesser of:  (A) the actual cost to Borrower of work and labor performed on the improvements and materials incorporated into the improvements or suitably stored on the applicable Property; or (B) the amounts allocated to the work, labor and materials in question on budgets and schedules of values approved by Lender multiplied by the percentage of completion (as reasonably determined by Lender) of such work, labor and materials (subject in all events to the ten percent (10%) retention).

ix.      Disbursements on account of soft costs shall be limited to the actual amounts of such costs as indicated by invoices, statements, vouchers, receipts or other written evidence satisfactory to Lender.

x.      Throughout the course of construction of the improvements, Lender shall have the right, in its good-faith discretion, to employ, at Borrower's sole cost and expense, an inspector or inspectors and a consultant or consultants who shall review as agent for Lender all construction activities undertaken in regard to any Property.  At Lender's election, in its sole discretion, such amounts may be payable out of the applicable Holdbacks.  If required by Lender, a certificate or indication from such inspector(s) and/or consultant(s) that construction complies with any Approved Plans and Specifications and any applicable budget (including percent

ATX000040

completion requirements and in-balance requirements herein) shall be a further condition precedent to Lender's approval of each draw request.

xi.      With respect to disbursements made by Lender to any Person other than Borrower, Lender shall have received conditional lien waivers (which conditional lien waiver shall be subject only to receipt of payment by such Person).  With respect to disbursements to Borrower, Lender shall have received conditional lien waivers, provided that (1) no more than Two Hundred Thousand and No/100 Dollars ($200,000.00) of conditional lien waivers outstanding at any time, and that Lender shall receive unconditional lien waives on the earlier to occur of (x) thirty (30) days after delivery of such conditional lien waiver and (b) prior to the next request for disbursement. All lien waivers and conditional lien waivers shall be executed by each contractor, subcontractor and materialman supplying labor or materials and any architect's certificates as to work completed as required by Lender.

xii.      Without limitation on the other terms and conditions contained herein, all disbursements from the Capital Holdback shall be pursuant to and for the purposes provided in the Capital Improvement Budget.  Any contingency under the Capital Improvement Budget may be used only with the prior written consent of Lender and for purposes approved in writing by Lender (in its sole discretion).

xiii.      Prior to any disbursements from the Capital Holdback, Borrower shall have (1) contributed all of the Additional Borrower Equity to pay for costs and expenses set forth in the Capital Improvement Budget, and (2) submitted to Lender and Lender shall have approved in Lender's sole discretion the Construction Documents, Construction Schedule, Construction Budget and the Construction Plans and Specifications.

(l)      Lender shall have received such other documents or items as Lender or its counsel may require in their good-faith discretion.

(m)      Lender, at its option and without further direction from Borrower, may disburse any improvements payment to the Person to whom payment is due or through an escrow satisfactory to Lender or directly to Borrower for payment to such Persons.  Borrower hereby irrevocably directs and authorizes Lender to so advance the proceeds of the Loan.  All sums so advanced shall constitute advances of the Loan and shall be secured by the Loan Documents.

## ARTICLE 4.
## BORROWER'S EQUITY

**4.1**  COMMITMENT.  Upon acquisition of the Properties, Borrower shall satisfy all terms and conditions of Section 3.1.1(aa) hereof.

## ARTICLE 5.
## INSURANCE

Borrower shall at all times keep the improvements now existing or hereafter erected on each Property insured against all losses, hazards, casualties, liabilities and contingencies as Lender shall require and in such amounts and for such periods as Lender shall require.  Borrower shall purchase and maintain the following policies of insurance with respect to each Property in form and substance satisfactory to Lender as follows:

ATX000041

**5.1**    **PROPERTY INSURANCE**.  Property insurance covering loss or damage by fire, lightning, water, wind and such other perils as are included in a standard "special causes of loss form" property insurance policy in an amount no less than one hundred percent (100%) of the replacement cost (including cost of demolition, increased costs to repair or rebuild the applicable Property to comply with current building, zoning or land use ordinance or law, and debris removal) of all real and personal property, including tenant improvements, twelve (12) months of gross rental income or business income with not less than an additional ninety (90) day period of extended indemnity coverage, and including such other endorsements as Lender may reasonably require, insuring against damage to the applicable Property in an amount acceptable to Lender.  The loss valuation clause of the policy shall be replacement cost value.  The deductible under such policy shall not exceed $25,000.  This policy shall contain ordinance or law coverage, including loss to undamaged parts of the building to the full building damage limit of the policy and with demolition and increased cost of construction insured to limits in an amount acceptable to Lender.  The policy shall contain a standard mortgagee insurance clause and a Lender's Loss Payable Endorsement or clause (ISO form CP 12 18 or equivalent) with Lender named on the policy as both mortgagee and loss payee.

**5.2**    **BOILER AND MACHINERY INSURANCE**.  Boiler and machinery (or equipment breakdown) insurance, in an amount which is no less than twenty percent (20%) of the sum of the one hundred percent (100%) replacement cost value of each Property, or such other amount agreed by Lender, plus an amount equivalent to the annual Gross Operating Income for the applicable Property, covering the mechanical breakdown of boilers, air conditioning equipment and other machinery and equipment in an amount deemed necessary by Lender.  The loss valuation clause of the policy shall be replacement value.

**5.3**    **FLOOD INSURANCE.**  Flood insurance if any Property lies within Flood Zones A or V, or if otherwise deemed necessary by Lender, in a form and with insured limits and deductibles acceptable to Lender.

**5.4**    **EARTHQUAKE INSURANCE**.  If any Property is in an area prone to geological phenomena, including, but not limited to, sinkholes, or mine subsidence, earth movement or earthquake, insurance covering such perils with insured limits and deductibles acceptable to Lender.  This policy shall include ordinance or law coverage as shown above in Section 5.1.  The loss valuation clause of the policy shall be replacement cost.

**5.5**    **TERRORISM INSURANCE.**  As required by Lender, Borrower shall provide evidence of insurance covering loss from acts of terrorism.

**5.6**    **LIABILITY INSURANCE**.  Commercial General Liability insurance with limits no less than $5,000,000 each occurrence and $5,000,000 in the aggregate for any policy year with Lender included as an additional insured with the coverage primary and non-contributory to any other valid and collectible insurance.  The use of a combination of primary and excess liability insurance policies shall be permitted in order to maintain the required limits of liability insurance.  All liability insurance policies must provide for claims to be insured on an occurrence basis.  All liability policies shall include coverage of a broad form standard, including, but not limited to, explosion, collapse and underground property damage (x,c,u), completed operations, broad form contractual liability, broad form property damage and personal injury coverage.

**5.7**    **CONSTRUCTION.**  During any period of construction, reconstruction, renovation or alteration of any Property at a cost in excess of ten percent (10%) of the stated amount of the Note, Borrower shall maintain at Borrower's sole expense, with licensed insurers approved by Lender, the following policies of insurance in form and substance satisfactory to Lender:

ATX000042

(a)     Builder's Risk Insurance coverage in any amount equal to one hundred percent (100%) of the completed value replacement cost of all improvements to be constructed, written on a Causes of Loss – Special Form or its equivalent, in a non-reporting completed value form.  The loss valuation clause of the policy shall be replacement cost value.  Coverage shall be extended to insure project soft costs to include one hundred percent (100%) of the cost during the construction term of construction loan interest, taxes and insurance and shall insure loss of income or rents in an amount equivalent to the gross income or loss of rents for an indemnity period of no less than twelve months.  Any exclusion for loss or damage to existing structures shall be removed from the policy.  The policy shall contain a basic perils deductible no greater than $25,000.00.  Coverage shall permit for partial occupancy by Borrower and shall insure all construction materials and supplies on the construction site, stored off-site and while in transit.  The policy shall include coverage of ordinance or law perils as shown above in Section 5.1 and of equipment breakdown perils as shown above in Section 5.2;

(b)     Borrower shall require of its contractor, and contractor shall purchase and maintain, (1) general liability insurance with limits of $3,000,000 each occurrence / $3,000,000 annual aggregate with Lender and Borrower included as additional insured with the coverage primary and non-contributory to any other valid and collectible insurance and, (2) worker's compensation as required by statute or law and to insure employer's liability in amount of at least $1,000,000 per occurrence.  Borrower shall require of the sub-contractors, and sub-contractors shall purchase and maintain, (1) general liability insurance with limits of $1,000,000 each occurrence / $1,000,000 annual aggregate with Lender and Borrower included as additional insured with the coverage primary and non-contributory to any other valid and collectible insurance and, (2) worker's compensation as required by statute or law and to insure employer's liability in amount of at least $1,000,000 per occurrence.

**5.8     GENERAL**.  All insurance policies contemplated by Section 5.1 hereof shall name Borrower as the insured.  All premiums on insurance policies shall be paid in full.  Borrower shall provide the Lender certified copies of all required insurance policies, or other evidence which is reasonably acceptable to Lender.  Property insurance certificates shall be issued using the ACORD 28 form.  All insurance policies shall provide that the insurance shall not be cancelable or materially changed without thirty (30) days prior written notice to Lender.  All policies, other than liability insurance policies, shall not contain any co-insurance clause or such clause shall be removed by an "agreed amount" endorsement. Lender shall be named under a Lender's Loss Payable Endorsement (ISO form CP 12 18 or equivalent) and as mortgagee with a standard form mortgagee clause applying on all non-liability insurance policies which Borrower maintains with respect to each Property and Improvements.  Borrower shall provide to Lender evidence, in a form as is reasonably required by Lender, of any other hazard insurance Lender may reasonably deem necessary at any time during the Loan.  Without limitation on the foregoing, all policies shall be insured by a licensed insurance company or companies with a rating of A- VIII or better by A.M. Best Co. and shall contain deductibles not in excess of five percent (5%) of the policy limits.

# ARTICLE 6.
## REPRESENTATIONS AND WARRANTIES

As a material inducement to Lender's entry into this Agreement, Borrower represents and warrants to Lender as of the Effective Date (and as of the date of any additional advances hereunder) and continuing thereafter that:

**6.1     AUTHORITY/ENFORCEABILITY**.  Borrower is in compliance with all laws and regulations applicable to its organization, existence and transaction of business and has all necessary rights and powers to own, develop and operate each Property and Improvements as contemplated by the Loan Documents.

ATX000043

**6.2     BINDING OBLIGATIONS**.  Borrower is authorized to execute, deliver and perform its obligations under the Loan Documents, and such obligations shall be valid and binding obligations of Borrower.

**6.3     FORMATION AND ORGANIZATIONAL DOCUMENTS**.  Borrower has delivered to Lender all formation and organizational documents of Borrower and of the managing member, partners, joint venturers or members of Borrower, if any, and of all Guarantors other than Guarantors which are natural persons, if any, and all such formation and organizational documents remain in full force and effect and have not been amended or modified since they were delivered to Lender.  As of the date hereof, the organizational chart set forth as Schedule I hereto accurately sets forth the ownership structure of Borrower and its Affiliates.  A true, correct and complete copy of the Certificate of Formation, or equivalent thereof, of Borrower filed with the Delaware Secretary of State on August 13, 2018, pursuant to which Borrower was formed, along with the Operating Agreement for each Borrower dated as of September 19, 2018, have been delivered to Lender, have not been amended, are in full force and effect, and all required filings with applicable authorities have been made with respect to Borrower. Borrower shall promptly provide Lender with copies of any amendments or modifications of the formation or organizational documents of Borrower and any Guarantor. The organizational chart set forth as <u>Schedule I</u> hereto accurately sets forth the ownership structure of Borrower and its Affiliates shown thereon.

**6.4     NO VIOLATION**.  Borrower's execution, delivery, and performance under the Loan Documents do not: (a) require any consent or approval not heretofore obtained under any partnership agreement, operating agreement, articles of incorporation, bylaws or other organizational document; (b) violate any Applicable Laws; or (c) conflict with, or constitute a breach or default or permit the acceleration of obligations under any agreement, contract, lease, or other document by which the Borrower is or any Property and Improvements are bound or regulated.

**6.5     COMPLIANCE WITH LAWS**.  Borrower has obtained, and at all times shall have obtained all permits, licenses, exemptions, and approvals necessary to construct, occupy, operate and market each Property and Improvements in accordance with the Approved Budget, and shall maintain compliance with all Applicable Laws. Each Property is a legal parcel lawfully created in full compliance with all subdivision laws and ordinances.

**6.6     LITIGATION**.  Except as disclosed to Lender in writing, there are no claims, actions, suits, or proceedings pending, or to Borrower's knowledge threatened, against Borrower or any Guarantor affecting any Property or Improvements.

**6.7     FINANCIAL CONDITION**.  All financial statements and information heretofore and hereafter delivered to Lender by Borrower, including, without limitation, information relating to the financial condition of Borrower, each Property, the Improvements, the partners, joint venturers or members of Borrower, each Guarantor, fairly and accurately represent the financial condition of the subject thereof in all material respects and have been prepared (except as noted therein) in accordance with GAAP (or such other prudent accounting principles reasonably acceptable to Lender) consistently applied.  Borrower acknowledges and agrees that Lender may request and obtain additional information from third parties regarding any of the above, including, without limitation, credit reports.

**6.8     NO MATERIAL ADVERSE CHANGE**.  There has been no material adverse change in the financial condition of Borrower and/or Guarantor since the dates of the latest financial statements furnished to Lender and, except as otherwise disclosed to Lender in writing, Borrower has not entered into any material transaction which is not disclosed in such financial statements.

ATX000044

**6.9**    **ACCURACY**.  All reports, documents, instruments, information and forms of evidence delivered to Lender concerning the Loan or security for the Loan or required by the Loan Documents are accurate, correct and sufficiently complete to give Lender true and accurate knowledge of their subject matter, and do not contain any misrepresentation or omission.

**6.10**    **TAX LIABILITY**.  Borrower has filed all required federal, state, county and municipal tax returns and has paid all taxes and assessments owed and payable, and Borrower has no knowledge of any basis for any additional payment with respect to any such taxes and assessments.

**6.11**    **COMPLIANCE**.  Borrower is familiar with and in compliance with all governmental requirements for the development, ownership and operation of each Property and construction of the Improvements and will conform to and comply with all governmental requirements and any Approved Plans and Specifications relating to any construction.

**6.12**    **ERISA**.

(a)    Borrower is not an entity deemed to hold "plan assets" within the meaning of 29 C.F.R. § 2510.3-101 of an employee benefit plan (as defined in Section 3(3) of ERISA) which is subject to Title I of ERISA or any plan (within the meaning of Section 4975 of the Code), and neither the execution of this Agreement nor the making of the Loan gives rise to a prohibited transaction within the meaning of Section 406 of ERISA or Section 4975 of the Code.

(b)    Borrower is not (i) an employee benefit plan (as defined in Section 3(3) of ERISA), (ii) a plan as defined in Section 4975(e)(1) of the Code, which is subject to Section 4975 of the Code, or (iii) an entity whose underlying assets constitute "plan assets" of any such employee benefit plan or plan for purposes of Title I of ERISA or Section 4975 of the Code.

**6.13**    **BUSINESS LOAN**.  The Loan is a business loan transaction in the stated amount solely for the purpose of carrying on the business of Borrower and none of the proceeds of the Loan will be used for the personal, family or agricultural purposes of the Borrower.

**6.14**    **PROPERTY MANAGEMENT AGREEMENT**.  Other than the Property Management Agreement, no Property is subject to any agreement which provides for the management, leasing and/or operation of any Property or Improvements and Borrower shall not enter into any such agreement without Lenders prior written consent.

**6.15**    **MATERIAL AGREEMENTS.**

(a)    Borrower has not entered into, and is not bound by, any Material Agreement which continues in existence, except those previously disclosed in writing to Lender.

(b)    Each of the Material Agreements is in full force and effect, there are no monetary or other defaults by Borrower thereunder and, to the best knowledge of Borrower, there are no monetary or other defaults thereunder by any other party thereto.  None of Borrower, Property Manager or any other Person acting on Borrower's behalf has given or received any notice of default under any Material Agreement that remains outstanding or in dispute.

(c)    Borrower has delivered true, correct and complete copies of the Material Agreements (including all amendments and supplements thereto) to Lender.

(d)    No Material Agreement or Operating Agreement has as a party which is an Affiliate of Borrower.

**6.16    LEASES**. The rent roll attached hereto as <u>Exhibit F</u> hereto is true, complete and correct and no Property is subject to any Leases or occupancy agreements other than as described in such <u>Exhibit F</u> (and without limitation, there are no agreements or documents affecting any of the Leases except as expressly listed on such <u>Exhibit F</u>). To Borrower's knowledge, the Leases identified on <u>Exhibit F</u> are in full force and effect and there are no defaults thereunder by either party (except as disclosed in the rent roll). The copies of the Leases delivered to Lender are true and complete, and there are no oral agreements with respect thereto. Except as disclosed by the rent roll, no rent (including security deposits) has been paid more than one (1) month in advance of its due date. All work to be performed by Borrower under each Lease has been performed as required and has been accepted by the applicable tenant. Any payments, free rent, partial rent, rebate of rent or other payments, credits, allowances or abatements required to be given by Borrower to any tenant has already been received by such tenant (except as disclosed in the rent roll). The tenants under the Leases have accepted possession of and are in occupancy of all of their respective demised premises and have commenced the payment of rent under the Leases.

**6.17    PATRIOT ACT AND RELATED MATTERS**. Borrower and Guarantor shall promptly comply with all existing and future federal, state and local laws, orders, ordinances, governmental rules and regulations or court orders affecting Borrower, any Property, or the use thereof, including, without limitation, Prescribed Laws (collectively, "Applicable Laws"). The term "Prescribed Laws" shall mean, collectively, (a) the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56) (the "Patriot Act"), (b) OFAC Laws and Regulations (as defined below), (c) the International Emergency Economic Power Act, 50 U.S.C. §1701 et. seq. and (d) all other legal requirements relating to money laundering or terrorism. Lender shall have the right to audit Borrower's compliance with the Prescribed Laws. Borrower shall from time to time, upon Lender's request, provide Lender with evidence reasonably satisfactory to Lender that each of Borrower and each Property complies with all Prescribed Laws or is exempt from compliance with Prescribed Laws. "OFAC Laws and Regulations" means any lists, laws, rules, sanctions and regulations maintained by the United States Department of the Treasury's Office of Foreign Assets Control ("OFAC") pursuant to any authorizing statute, Executive Order No. 13224 (September 23, 2001) and any related enabling or implementing executive orders or regulation, including the Trading with the Enemy Act, 50 U.S.C. App. 1-44, as amended from time to time, the International Emergency Economic Powers Act, 50 U.S.C. §§ 1701-06, as amended from time to time, the unrepealed provisions of the Iraqi Sanctions Act, Pub. L. No. 101-513; United Nations Participation Act, 22 U.S.C. § 287c, as amended from time to time, the International Security and Development Cooperation Act, 22 U.S.C. § 2349 aa 9, as amended from time to time, The Cuban Democracy Act, 22 U.S.C. §§ 6001-10, as amended from time to time, The Cuban Liberty and Democratic Solidarity Act, 18 U.S.C. §§ 2332d and 2339b, as amended from time to time, and The Foreign Narcotics Kingpin Designation Act, Pub. L. No. 106-120, as amended from time to time.

**6.18    NO BANKRUPTCY**. No bankruptcy or insolvency proceedings are pending or contemplated by Borrower or, to the best knowledge of Borrower, against Borrower or by or against any endorser or cosigner of the Note, or any guarantor or indemnitor under any guaranty or indemnity agreement executed in connection with the Note or the loan evidenced thereby and secured hereby.

**6.19    NOT FOREIGN PERSON**. Borrower is not a "foreign person" within the meaning of §1445(f)(3) of the Internal Revenue Code of 1986, as amended, and the related Treasury Department regulations, including temporary regulations.

**6.20    PURCHASE AGREEMENT**. Borrower has delivered to Lender a true, correct and complete copy of the Purchase Agreement (which has not been amended except as included in the definition

of Purchase Agreement). There are no defaults by Borrower thereunder, any Affiliate of Borrower or, to Borrower's knowledge, Seller thereunder.

# ARTICLE 7.
# HAZARDOUS MATERIALS

**7.1**      <u>**SPECIAL REPRESENTATIONS, WARRANTIES AND COVENANTS**</u>.

(a)      Borrower hereby represents and warrants to Lender that, as of the date hereof, to the best of Borrower's knowledge and except as disclosed to Lender in writing prior to the Effective Date: (i) no Property is in material violation of any local, state or federal law, rule or regulation pertaining to environmental regulation, contamination or clean-up (collectively, "<u>Environmental Laws</u>"), including, without limitation, the Comprehensive Environmental Response, Compensation and Liability Act of 1980 (42 U.S.C. §9601 <u>et seq</u>. and 40 CFR §302.1 <u>et seq</u>.), as amended by the Superfund Amendments and Reauthorization Act of 1986; the Resource Conservation and Recovery Act of 1976 (42 U.S.C. §6901 <u>et seq</u>.); the Federal Water Pollution Control Act (33 U.S.C. §1251 <u>et seq</u>. and 40 CFR § 116.1 <u>et seq</u>.); those relating to Lead Based Paint (as defined below); the Hazardous Materials Transportation Act (49 U.S.C. §1801 <u>et seq</u>.); the Clean Air Act, 42 U.S.C. §7401 <u>et seq</u>; the Toxic Substances Control Act; 15 U.S.C. §2601 et seq; the Safe Drinking Water Act) (42 U.S.C. §300f <u>et seq</u>); the Texas Water Code §§26.001 et. seq. (including but not limited to §26.346); and the Texas Health & Safety Code §§361.001 et. seq.; and the regulations promulgated pursuant to said laws, all as same may have been or may be amended relating to or affecting any Property, any portion thereof, whether or not caused by or within the control of Borrower; (ii) to the best of Borrower's knowledge, no hazardous, toxic or harmful substances, wastes, materials, pollutants or contaminants (including, without limitation, asbestos, polychlorinated biphenyls, petroleum products, flammable explosives, radioactive materials, infectious substances or raw materials which include hazardous constituents), paint containing more than 0.5% lead by dry weight ("<u>Lead Based Paint</u>") or any other substances or materials which are included under or regulated by Environmental Laws, or any mold (collectively, "<u>Hazardous Substances</u>"), are located on or have been handled, generated, stored, processed or disposed of on or released or discharged from any Property (including underground contamination) except for those substances used by Borrower in the ordinary course of Borrower's business and in compliance with all Environmental Laws; (iii) no Property is subject to any private or governmental lien or judicial or administrative notice or action relating to Hazardous Substances; (iv) to the best of Borrower's knowledge, there are no existing or closed underground storage tanks or other underground storage receptacles for Hazardous Substances on any Property; (v) Borrower has received no written notice of and, to the best of Borrower's knowledge, there exists no investigation, action, proceeding or claim by any agency, authority or unit of government or by any third party which could result in any liability, penalty, sanction or judgment under any Environmental Laws with respect to any condition, use or operation of any Property nor does Borrower know of any basis for such a claim; and (vi) Borrower has received no notice of and, to the best of Borrower's knowledge, there has been no claim by any party that any use, operation or condition of any Property has caused any nuisance or any other liability or adverse condition on any other property nor does Borrower know of any basis for such a claim.

(b)      Borrower shall keep or cause each Property to be kept free from Hazardous Substances (except those substances used by Borrower in the ordinary course of its business and in compliance with all Environmental Laws), shall not install or use any underground storage tanks, shall expressly prohibit the use, generation, handling, storage, production, processing and disposal of Hazardous Substances (except those substances used by Borrower in the ordinary course of its business and in compliance with all Environmental Laws), and, without limiting the generality of the foregoing, so long as this Agreement continues in effect, shall not install in the Improvements or permit to be installed in the Improvements asbestos or any substance containing asbestos.

(c)      Borrower shall immediately notify Lender if Borrower shall become aware of the possible existence of (i) any Hazardous Substances on any Property (except those substances used by Borrower in the ordinary course of its business and in compliance with all Environmental Laws), or other potential environmental problem or liability, with respect to any Property, (ii) any lien, action or notice affecting any Property or Borrower resulting from any violation or alleged violation of the Environmental Laws, (iii) the institution of any investigation, inquiry or proceeding concerning Borrower or any Property pursuant to any Environmental Law or otherwise relating to Hazardous Substances, or (iv) the discovery of any occurrence, condition or state of facts which would render any representation or warranty contained in this Agreement incorrect in any respect if made at the time of such discovery or (v) that any Property is in violation of any Environmental Laws.  Further, immediately upon receipt of the same, Borrower shall deliver to Lender copies of any and all orders, notices, permits, applications, reports, and other communications, documents and instruments pertaining to the actual, alleged or potential presence or existence of any Hazardous Substances at, on, about, under, within in connection with any Property. Borrower shall, promptly following written request thereof by Lender, at Borrower's sole cost and expense, and regardless of the source of contamination, take all actions as shall be reasonably necessary or advisable for the clean-up of any and all portions of any Property or other affected property, including, without limitation, all investigative, monitoring, removal, containment and remedial actions in accordance with all applicable Environmental Laws (and in all events in a manner reasonably satisfactory to Lender), and shall further pay or cause to be paid, at no expense to Lender, all clean-up, administrative and enforcement costs of applicable governmental agencies which may be asserted against any Property.  In the event Borrower fails to do so, Lender may, but shall not be obligated to, cause any Property or other affected property to be freed from any Hazardous Substances or otherwise brought into conformance with Environmental Laws and any and all costs and expenses incurred by Lender in connection therewith shall be paid by Borrower within five (5) days after written notice from Lender itemizing the amounts thereof incurred to the date of such notice.  In the event Borrower fails to pay such costs and expenses within five (5) days after such written notice from Lender, such costs and expenses, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately due and payable by Borrower on demand and shall be secured by this Agreement and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.  In furtherance of the foregoing, Borrower hereby grants to Lender and Lender's agents and employees access to each Property during normal business hours and an irrevocable license to remove any items reasonably deemed by Lender to be Hazardous Substances and to do all things Lender shall deem necessary to bring each Property in conformance with Environmental Laws.  Borrower covenants and agrees, at Borrower's sole cost and expense, to indemnify, defend, protect (at trial and appellate levels, and with attorneys, consultants and experts reasonably acceptable to Lender), and hold Lender harmless from and against any and all present and future liens, damages, losses, liabilities, obligations, settlement payments, penalties, assessments, citations, directives, claims, litigation, demands, defenses, judgments, suits, proceedings, costs, disbursements or expenses of any kind or of any nature whatsoever (including, without limitation, reasonable attorneys', reasonable consultants' and reasonable experts' fees and disbursements actually incurred in investigating, defending, settling or prosecuting any claim, litigation or proceeding) (collectively, "Costs") which may at any time be imposed upon, incurred by or asserted or awarded against Lender or any Property, and arising directly or indirectly from or out of:  (i) the violation of any Environmental Laws relating to or affecting any Property, whether or not caused by or within the control of Borrower;  (ii) the actual or alleged presence, release or threat of release of any Hazardous Substances now or hereafter, on, in, under or affecting all or any portion of any Property, regardless of whether or not caused by or within the control of Borrower; (iii) the failure by Borrower to comply fully with the terms and conditions of this Section 7.1; (iv) the breach of any representation or warranty contained in this Section 7.1; or (v) the enforcement of this Section 7.1(c), including, without limitation, the cost of assessment, containment and/or removal of any and all Hazardous Substances from all or any portion of any Property, the cost of any actions required to be taken under this Section 7.1 in response to the presence, release or threat of release of any Hazardous Substances on, in, under, within or otherwise affecting any portion of

any Property to prevent or minimize such release or threat of release so that it does not migrate or otherwise cause or threaten danger to present or future public health, safety, welfare or the environment, and costs incurred to comply with the Environmental Laws in connection with all or any portion of any Property. The indemnity set forth in this <u>Section 7.1(c)</u> shall also include, without limitation, any diminution in the value of the security afforded by any Property or any future reduction in the sales price of any Property by reason of any matter set forth in this <u>Section 7.1(c)</u>. Notwithstanding anything contained herein to the contrary, in no event shall Borrower be liable for or be obligated to indemnify Lender for Costs resulting solely from Lender's gross negligence or willful misconduct. Lender's rights under this <u>Section 7.1(c)</u> shall survive payment in full of the indebtedness secured hereby and shall be in addition to all other rights of Lender under this Agreement, the Note and the other Loan Documents.

(d)       Upon Lender's request, at any time and from time to time after the occurrence of an Event of Default hereunder or at such other time as Lender has reasonable grounds to believe that Hazardous Substances are or have been released, stored or disposed of on or around any Property or that any Property may be in violation of the Environmental Laws, Borrower shall provide, at Borrower's sole cost and expense, an inspection or audit of the applicable Property prepared by a hydrogeologist or environmental engineer or other appropriate consultant reasonably approved by Lender indicating the presence or absence of Hazardous Substances on the applicable Property or an inspection or audit of the Improvements prepared by an engineering or consulting firm approved by Lender indicating the presence or absence of friable asbestos or substances containing asbestos on the applicable Property, as applicable. If Borrower fails to provide such inspection or audit within thirty (30) days after such request, without waiving any other rights or remedies of Lender by reason of Borrower's failure to do so, Lender may order the same, and Borrower hereby grants to Lender and Lender's employees and agents access to each Property during normal business hours and an irrevocable license to undertake such inspection or audit. The cost of such inspection or audit shall be paid by Borrower within five (5) days after written notice from Lender itemizing the amounts thereof incurred to the date of such notice. In the event Borrower fails to pay such cost within five (5) days after such written notice from Lender, such cost, together with interest thereon at the Default Interest Rate from the date incurred by Lender until actually paid by Borrower, shall be immediately due and payable to Lender by Borrower on demand and shall be secured hereby and by all of the other Loan Documents securing all or any part of the indebtedness evidenced by the Note.

(e)       Reference is made to the Environmental Indemnity Agreement. The provisions of this Agreement and the Environmental Indemnity Agreement shall be read together to maximize the coverage with respect to the subject matter thereof, as determined by Lender; <u>provided</u>, <u>however</u>, the obligations of the Indemnitors (as defined in the Environmental Indemnity Agreement) are not secured by the liens and security interests under this Agreement, as more fully set forth in the Environmental Indemnity Agreement.

(f)       Borrower agrees that if it has been, or if at any time hereafter it is, determined that any Property contains Lead Based Paint, on or before thirty (30) days following (i) the date hereof, if such determination was made prior to the date hereof or (ii) receipt of a an assessment report describing the location and condition of the Lead-Based Paint (a "<u>Lead Based Paint Report</u>") making such determination, if such determination is hereafter made, as applicable, Borrower shall, at Borrower's sole cost and expense, develop and implement, and thereafter diligently and continuously carry out (or cause to be developed and implemented and thereafter diligently and continuously to be carried out), an operations, abatement and maintenance plan for the Lead Based Paint on the applicable Property, which plan shall be prepared by an expert reasonably approved by Lender, and be in form, scope and substance reasonably acceptable to Lender (together with any Lead-Based Paint Report, the "<u>O&M Plan</u>") (If an O&M Plan has been prepared prior to the date hereof, Borrower agrees to diligently and continually carry out (or cause to be carried out) the provisions thereof.) Compliance with the O&M Plan shall require or be deemed to require, without

ATX000049

limitation, the proper preparation and maintenance of all records, papers and forms required under the Environmental Laws.

(g) Borrower agrees that if it has been, or if at any time hereafter it is, determined that any Property contains asbestos-containing materials ("ACM's"), on or before thirty (30) days following (i) the date hereof, if such determination was made prior to the date hereof or (ii) receipt of a report prepared by an environmental consultant making such determination, if such determination is hereafter made, as applicable, Indemnitors shall, at their sole cost and expense, develop and implement, and thereafter diligently and continuously carry out (or cause to be developed and implemented and thereafter diligently and continually to be carried out), an operations and maintenance program (the "Maintenance Program") designed by an environmental consultant, reasonably approved by Lender, with respect to the ACM's, consistent with "Guidelines for Controlling Asbestos-Containing Materials in Buildings" (ISOPIA, 1985) and other relevant guidelines, and such Maintenance Program will hereafter continuously remain in effect until the Loan is repaid in full. In furtherance of the foregoing, Borrower shall inspect and maintain all ACM's on a regular basis and ensure that all ACM's shall be maintained in a condition that prevents exposure of occupants to ACM's at all times. Without limiting the generality of the preceding sentence, provided a Maintenance Program is in place, Lender may reasonably require (i) periodic notices or reports to Lender in form, substance and at such intervals as Lender may specify, (ii) an amendment to such Maintenance Program to address changing circumstances, laws or other matters, (iii) at Borrower's sole cost and expense, supplemental examination of the applicable Property by consultants specified by Lender (but not more frequently than once in any calendar year unless an Event of Default has occurred and is continuing), and (iv) variation of the Maintenance Program in response to the reports provided by any such consultants.

7.2 **LEGAL EFFECT OF SECTION**. Borrower and Lender agree that Borrower's duty to indemnify Lender hereunder shall survive: (i) any judicial or non-judicial foreclosure under the Security Instrument, or transfer of any Property in lieu thereof; (ii) the release and reconveyance or cancellation of the Security Instrument; and (iii) the satisfaction of all of Borrower's obligations under the Loan Documents.

**ARTICLE 8.**
**RECONVEYANCE**

8.1 **FULL REPAYMENT AND RECONVEYANCE**. Upon indefeasible payment in full of all sums owing and outstanding under the Loan Documents other than contingent liabilities for which no claim has then been made, Lender shall issue a full release and reconveyance of each Property and Improvements from the lien of the Security Instrument; provided, however, that all of the following conditions shall be satisfied at the time of, and with respect to, such reconveyance and remittance: (a) Lender shall have received all escrow, closing and recording costs, the costs of preparing and delivering such reconveyance and any sums then due and payable under the Loan Documents; (b) Lender shall have received the Exit Fee (as defined in the Note) and any prepayment premiums provided for in the Note; and (c) Lender shall have received a written release satisfactory to Lender of any set aside letter, letter of credit or other form of undertaking which Lender has issued to any surety, governmental agency or any other party in connection with the Loan and/or any Property and Improvements. Lender's obligation to make further disbursements under the Loan shall terminate as to any portion of the Loan undisbursed as of the date of issuance of such full release or reconveyance, and any commitment of Lender to lend any undisbursed portion of the Loan shall be canceled.

ATX000050

## ARTICLE 9.
## COVENANTS OF BORROWER

**9.1**     **EXPENSES**. Borrower shall pay, whether or not the closing of the Loan occurs, all of the reasonable Lender expenses and all other third-party costs and expenses incurred by Lender or any of its Affiliates, from time to time, including documentation and diligence fees and expenses, all search, audit, appraisal, recording, professional and filing fees and expenses and all other out-of-pocket charges and expenses (including UCC and judgment and tax lien searches and UCC filings and fees for post-closing UCC and judgment and tax lien searches, if required by Lender), all servicing fees and expenses and attorneys' fees incurred (a) in any effort to enforce, protect or collect payment of any obligations hereunder or otherwise secured by the Security Instrument or to enforce any Loan Document or any related agreement, document or instrument, or effect collection hereunder or thereunder, (b) in connection with entering into, negotiating, preparing, reviewing and executing this Agreement and the other Loan Documents and all related agreements, documents and instruments, (c) arising in any way out of administration of the Loan including any wire transfer fees or audit expenses and a servicing fee equal to 0.1% per annum of the original, maximum principal balance of the Loan payable in arrears on each Payment Date, (d) in connection with instituting, maintaining, preserving, enforcing and foreclosing on Lender's security interests, whether through judicial proceedings or otherwise, (e) in connection with reviewing Borrower's compliance with insurance requirements (both prior to the Effective Date and thereafter during the term of the Loan), (f) in defending or prosecuting any actions, claims or proceedings arising out of or relating to Lender's transactions with Borrower or any Guarantor, (g) in seeking, obtaining or receiving any advice with respect to its rights and obligations under this Agreement, any of the other Loan Documents and all related agreements, documents and instruments, or (h) in connection with any modification, restatement, supplement, amendment, waiver or extension of this Agreement or any other Loan Document or any related agreement, document or instrument, and all of the same may be charged to Borrower's account and shall be part of the obligations secured by the Security Instrument. Borrower recognizes and agrees that formal written appraisals of each Property and Improvements by a licensed independent appraiser may be required by Lender's internal procedures and/or federal regulatory reporting requirements on an annual and/or specialized basis and that Lender may, at its option, require inspection of each Property and Improvements by an independent supervising architect and/or cost engineering specialist: (i) at least once each month during the course of any capital improvement project/construction at each Property; (ii) upon completion of any new or remodeled Improvements; and (iii) at least semi-annually thereafter. If any of the services described above are provided by an employee of Lender, Lender's costs and expenses for such services shall be calculated in accordance with Lender's standard charge for such services.

**9.2**     **ERISA COMPLIANCE**. Borrower shall at all times comply with the provisions of ERISA with respect to any retirement or other employee benefit plan to which it is a party as employer, and as soon as possible after Borrower knows, or has reason to know, that any Reportable Event (as defined in ERISA) with respect to any such plan of Borrower has occurred, it shall furnish to Lender a written statement setting forth details as to such Reportable Event and the action, if any, which Borrower proposes to take with respect thereto, together with a copy of the notice of such Reportable Event furnished to the Pension Benefit Guaranty Corporation.

**9.3**     **LEASING**.

       (a)     All Leases (and expansions, renewals or modifications of Leases, and any cancellation or termination of any such Leases) of all or any part of any Property and Improvements shall be with Tenants approved by Lender in writing and upon terms approved in writing by Lender in its sole but good faith discretion prior to Borrower's execution of any such Major Lease (or expansion, renewal or modification of a Lease). Borrower shall deliver to Lender

ATX000051

true, complete and correct copies of any proposed Lease (or proposed expansion, renewal or modification of a Lease) requiring Lender's approval in accordance with Section 12.4 below and Lender shall approve or disapprove such proposed Lease (or proposed expansion, renewal or modification of a Lease) within ten (10) Business Days after its receipt of the same.  In the event Lender does not approve or disapprove the proposed Lease (or proposed expansion, renewal or modification of a Lease) within such ten (10) Business Day period, then the proposed lease shall be deemed approved, provided that such deemed approval shall only be effective if (a) the envelope in which the proposed lease is delivered to Lender and the transmittal memo accompanying both have written the following notice in bold-face capital letters in 14-point font or larger: "RESPONSE REQUIRED WITHIN TEN (10) BUSINESS DAYS OF RECEIPT.  FAILURE TO DISAPPROVE THE SAME SHALL BE DEEMED APPROVAL IF NOT DISAPPROVED IN WRITING PRIOR TO THE EXPIRATION OF TEN (10) BUSINESS DAYS AFTER RECEIPT", and (b) Borrower delivers to Lender a second (2nd) notice containing the same language not earlier than three (3) Business Days prior to the expiration of the aforementioned 10-Business Day notice period.

(b)     At least sixty (60) says prior to the commencement of rent payments under any Lease at any Property, Borrower shall (1) establish an account (the "Account"), with a financial institution acceptable to Lender ("Depository"), pursuant to a clearing and deposit agreement acceptable to Lender and (2) enter into the Lockbox Agreement. The Account shall be in the name of Borrower, maintained in accordance with the Lockbox Agreeent, and shall be subject to a Deposit Account Control Agreement.

9.4     **APPLICATION OF GROSS OPERATING INCOME**. Borrower shall apply all Gross Operating Income from each Property and Improvements pursuant to the Approved Budget and otherwise in accordance with the terms of the Loan Documents

9.5     **SUBDIVISION MAPS**.  Borrower shall have no right to record any final map, plat, parcel map, lot line adjustment or other subdivision map of any kind covering any portion of any Property (collectively, "Subdivision Map"), without Lender's prior written consent, which approval may be granted or withheld in Lender's sole and absolute discretion.  Without limitation on the foregoing, Lender shall also have the right to approve, in its sole and absolute discretion, any changes to or amendments of the current zoning for any Property.

9.6     **FURTHER ASSURANCES**.  Upon Lender's request and at Borrower's sole cost and expense, Borrower shall execute, acknowledge and deliver any other instruments and perform any other reasonable acts necessary, desirable or proper, as determined by Lender, to carry out the purposes of this Agreement and the other Loan Documents or to perfect and preserve any liens created by the Loan Documents.

9.7     **ASSIGNMENT**.  Without the prior written consent of Lender in its sole discretion, Borrower shall not assign Borrower's interest under any of the Loan Documents, or in any monies due or to become due thereunder, and any assignment without such consent shall be void.  In this regard, Borrower acknowledges that Lender would not make this Loan except in reliance on Borrower's expertise, reputation, prior experience in owning and operating commercial real property, Lender's knowledge of Borrower, and Lender's understanding that this Agreement is more in the nature of an agreement involving personal services than a standard loan where Lender would rely on security which already exists.

9.8     **[RESERVED].**

**9.9**      **TRANSFERS**.  By delivery of this Agreement, Borrower acknowledges that the financial standing and managerial and operational ability of Borrower are substantial and material considerations to Lender in its agreement to make the Loan and that any encumbrance or transfer of an interest in any Property or in Borrower whether direct or indirect, will materially impair Lender's security under the Security Instrument.  To induce Lender to make the Loan, Borrower agrees Borrower shall not effect a Transfer, either directly or indirectly, or by operation of law, without in each instance first obtaining Lender's prior written consent, which consent may be withheld for any reason, or given upon such terms and conditions as Lender deems necessary or appropriate, all within Lender's sole and absolute discretion, to the extent permitted by Applicable Law.  Upon any Transfer made in violation of this Section 9.9, without limitation on Lender's other rights, Lender shall have the absolute right in its sole discretion, without demand or notice, to declare all sums, indebtedness and obligations secured by this Agreement and the other Loan Documents to be immediately due and payable (including the Yield Maintenance and the Exit Fee (as each such term is defined in the Note)), except to the extent that and in such particular circumstances where exercise of such right by Lender is prohibited by law.  Any Transfer effected pursuant to a consent by Lender shall be subject to this Agreement and the other Loan Documents, and any direct transferee shall, as a condition of the effectiveness of any such consent and as a covenant of Borrower and such transferee, and in form and substance prescribed by Lender, assume all obligations hereunder and agree to be bound by all provisions contained herein.  Such assumption shall not, however, release Borrower or any maker or guarantor (including any Guarantor) from any liability thereunder.

Notwithstanding the preceding provisions of Section 9.9, provided no Default or Event of Default exists hereunder and provided a transfer would not cause a Default or Event of Default (including a default under Section 9.10 hereof) or result in a change in the day to day Control of Borrower, transfers (but not encumbrances) of ownership interests, whether direct or indirect in Borrower, shall be permitted hereunder, provided at all times the management of Borrower is Controlled by Guarantor and Guarantor at all times owns, directly or indirectly, at least fifty percent (50%) of the ownership interests in Borrower; provided, the following conditions are satisfied: (i) Borrower shall give Lender written notice of such transfer, with copies of all instruments effecting such transfer (at least ten (10) Business Days prior to the proposed transfer) and (b) Borrower shall promptly cause to be delivered to Lender any amendment to the Loan Documents as may be required by Lender, including execution and delivery of any new pledge agreements and UCC financing statements (it being understood that no transfers permitted herein shall negate, circumvent or otherwise adversely impact any pledges of ownership interests held by Guarantor or an Affiliate of Guarantor and delivered to Lender or an Affiliate of Lender).  Borrower shall pay any and all reasonable costs and expenses of Lender incurred in connection with such transfer (including, without limitation, reasonable attorneys' fees and expenses).  In addition, the transfer or pledge of ownership interests in Borrower delivered to Lender or an Affiliate of Lender shall be permitted.

**9.10**      **SINGLE PURPOSE ENTITY**.  Borrower hereby represents and warrants to, and covenants with, Lender that Borrower has been, is and shall remain a single purpose bankruptcy remote entity and shall at all times comply with the following covenants:

(a)      The purpose for which Borrower is organized shall be limited to (i) acquiring, owning, developing, holding, selling, leasing, transferring, exchanging, operating and managing Borrower's interest in the Properties, (ii) entering into the Loan, (iii) refinancing the Loan in connection with a permitted repayment of the Loan, and (iv) transacting any and all lawful business that is incident, necessary and appropriate to accomplish the foregoing.

(b)      Borrower has not owned, does not own and will not own any asset or property other than (i) its interest in the Properties and (ii) incidental personal property necessary for and used in connection with the ownership or operation of the same.

ATX000053

(c)     Borrower shall not engage in a business other than the ownership, operation and management of the Properties and acquire any other property without Lender's prior written consent.

(d)     Borrower shall not enter into any contract or agreement with any Affiliate, any Guarantor, without Lender's prior written consent.

(e)     Borrower shall not incur, create, assume or guarantee any indebtedness or liabilities, secured or unsecured, direct or contingent, other than (i) the Loan and incidental costs and expenses associated therewith, (ii) unsecured indebtedness incurred in the ordinary course of business of owning, operating, and maintaining the Properties, that (A) are in such amounts that are normal and reasonable under the circumstances (but in no event more than one percent (1.00%) of the Outstanding Principal Balance (in the aggregate together with all trade payables or accrued expenses incurred by Borrower)), (B) are not evidenced by a note, and (C) are required to be paid within sixty (60) days from the date they are first incurred by Borrower, and (iii) non-delinquent property taxes and assessments.  No indebtedness other than the Loan may be secured (subordinate or pari passu) by the Properties, and no indebtedness may be secured, directly or indirectly, by any partnership, membership or other equity interest in Borrower (comprising the same) without Lender's consent in Lender's sole and absolute discretion.

(f)     Borrower has not made and will not make any loans or advances to any Person or entity and shall not acquire obligations or securities of an Affiliate.

(g)     Provided there is sufficient cash flow from the Properties, Borrower is and will remain solvent and Borrower will pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due.

(h)     Borrower has done or caused to be done and will do all things necessary to observe organizational formalities and preserve its existence, and Borrower will not amend, modify or otherwise change, in violation of the covenants of this Section 9.10 or organizational documents of Borrower, as the case may be without the written consent of Lender.

(i)     Borrower shall maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates.  Borrower's assets will not be listed as assets on the financial statement of any other Person.  Borrower shall have its own separate financial statement, provided, however, that Borrower's assets may be included in a consolidated financial statement of its parent companies if inclusion on such a consolidated statement is required to comply with the requirements of GAAP, and provided, further, that such consolidated financial statement shall contain a footnote to the effect that Borrower's assets are owned by Borrower, as the case may be and that they are being included on the financial statement of its parent solely to comply with the requirements of GAAP, and provided, further, that such assets shall be listed on Borrower's own separate balance sheet.  Borrower will file its own tax returns (unless a disregarded entity for tax purposes) and will not file a consolidated federal income tax return with any other corporation.  Borrower shall maintain its books, records, resolutions and agreements as official records.

(j)     Borrower will be, and at all times will hold itself out to the public as, a legal entity separate and distinct from any other Person, shall correct any known misunderstanding regarding its status as a separate entity, shall conduct business in its own name and shall not identify itself or any of its Affiliates as a division or part of the other.

(k)     Provided there is sufficient cash flow from the Properties, Borrower will maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations.

ATX000054

(l)    Borrower has not nor at any time sought nor will seek the dissolution, winding up, liquidation, consolidation or merger, in whole or in part, or the sale of material assets of Borrower except in connection with a payoff of the Loan.

(m)    Borrower will not commingle the funds and other assets of Borrower with those of any other Person, and will not participate in a cash management system with any such Person.

(n)    Borrower will not commingle its assets with those of any other Person and will hold all of its assets in its own name.

(o)    Borrower will not guarantee or become obligated for the debts of any other Person and has not, does not and will not in the future hold itself out as being responsible for the debts or obligations of any other Person.

(p)    Borrower shall not pledge its assets for the benefit of any other Person, other than with respect to the Loan.

(q)    Borrower shall not file a petition for relief under the Bankruptcy Code, or under any other present or future state of federal law regarding bankruptcy, reorganization or other debtor relief law.

(r)    Borrower shall not partition and shall not permit any partition of any Property.

**9.11    MATERIAL AGREEMENTS.**

(a)    Borrower shall (i) promptly perform and/or observe the covenants, agreements and conditions required to be performed and observed by it under each Material Agreement and Operating Agreement to which it is a party, and do all things necessary to preserve and to keep unimpaired its rights thereunder, (b) promptly notify Lender in writing of the giving of any notice of any default by any party under any Material Agreement and Operating Agreement of which it is aware and (c) promptly enforce the performance and observance of all of the covenants, agreements and conditions required to be performed and/or observed by any other party under each Material Agreement and Operating Agreement to which Borrower is a party in a commercially reasonable manner

(b)    Borrower shall not, without Lender's prior consent: (a) enter into, surrender or terminate any Material Agreement or Operating Agreement to which it is a party or to which Borrower or any Property is subject (unless, with respect to Material Agreements (other than Leases), the other party thereto is in material default and the termination of such agreement would be commercially reasonable), (b) increase or consent to the increase of the amount of any charges under any Material Agreement or Operating Agreement to which it is a party or to which Borrower or any Property is subject, except as provided therein or, with respect to Material Agreements (other than Leases), on an arm's-length basis and commercially reasonable terms; or (c) otherwise modify, change, supplement, alter or amend, or waive or release any of its rights and remedies under any Material Agreement or Operating Agreement to which it is a party or to which Borrower or any Property is subject in any material respect, except, with respect to Material Agreements (other than Leases), on an arm's-length basis and commercially reasonable terms.

**9.12    COMPLETION OF REQUIRED CAPITAL IMPROVEMENTS AND TENANT IMPROVEMENTS COMMENCED BY BORROWER**.    Borrower shall complete all capital improvements required under any Capital Improvement Budget and the Approved Budget and this Agreement, and any tenant improvements commenced by Borrower, each on-time and free and clear of any liens.  Without limitation on the foregoing, Borrower shall complete all capital improvements it commences

ATX000055

which are not required by the Approved Budget and this Agreement, which Lender subsequently approves in writing as required hereunder.

**9.13    IN-BALANCE**.  Borrower shall at all times cause  the undisbursed Loan funds to be equal to or greater than the amount which Lender from time to time determines necessary to: (a) pay, through completion, all costs of development, construction of the Improvements in accordance with the Construction Documents approved by Lender and any Approved Budget; (b) pay all sums which may accrue under the Loan Documents prior to repayment of the Loan; (c) enable Borrower to perform and satisfy all of the covenants of Borrower contained in the Loan Documents.  Furthermore, without limitation of the immediately preceding sentence Borrower shall at all times cause (x) the undisbursed portion of the Capital Holdback to be equal to or greater than the amount which Lender from time to time determines necessary to pay, through completion, all costs to complete all work required to be completed under the Capital Improvement Budget, and (y) there to be no Interest Reserve Deficiency (collectively "In-Balance").  If Lender determines at any time that the undisbursed Loan funds (and available Holdbacks and Reserves) are insufficient for said purposes, then Borrower shall deposit the amount of such deficiency into the applicable Reserve designated by Lender within ten (10) Business Days of Lender's written demand and, notwithstanding anything to the contrary in this Agreement, Lender shall not be required to disburse any proceeds of the Loan until Borrower deposits the applicable amount of such deficiency in an account as required by this paragraph.  Any funds deposited in accordance with this paragraph shall be available for payment of costs and expenses enumerated in this paragraph prior to any additional Reserve funds being made available for payment of such costs by Lender.

**9.14    BORROWER EQUITY.**  Borrower shall cause the Borrower Equity to be contributed to or applied in payment of the costs and expenses incurred by Borrower in connection with Borrower's acquisition of the Properties (none of which shall be removed as Borrower's equity from the Properties or utilized to pay any fees, costs, refunds or other charges for the Properties or the Loan transaction), including the payment to Seller of a portion of the purchase price payable for the Properties, prior to the disbursement by Lender of any initial proceeds of the Loan or disbursements of the Loan subsequent to the Effective Date.

**9.15    LOAN TO VALUE RATIO.**  At all times, Borrower shall cause the Properties to maintain a Loan-to-Value Ratio of no more than seventy percent (70%).

**9.16    PROPERTY MANAGEMENT AGREEMENT**.  Without the prior written consent of Lender, Borrower shall not enter into any agreement which provides for the management, leasing and/or operation of any Property or Improvements.  Any such agreements approved by Lender shall expressly provide that they are subordinate to Lender's rights and interests under the Loan and the Loan Documents in all respects.  Any property managers and leasing agents for any Property shall be subject to Lender's prior approval and, at Lender's request, Borrower shall cause each such property manager or leasing agent to execute and deliver to Lender a consent and agreement to the foregoing provisions in form and substance acceptable to Lender.

Notwithstanding the preceding provisions of Section 9.15, provided no Default or Event of Default exists hereunder, Borrower shall be permitted to replace a Property Manager with a replacement property manager ("Replacement Property Manager") without Lender's prior written consent, provided that Replacement Property Manager is under the control of the Guarantor and provided, the following conditions are satisfied: (i) Borrower shall give Lender written notice of such replacement, with copies of all instruments effecting such replacement (at least ten (10) Business Days prior to the proposed replacement), (ii) the terms of the new property management agreement are not materially less favorable to Borrower and Lender than those in the existing Property Management Agreement and (iii) Borrower shall promptly cause

ATX000056

to be delivered to Lender any amendment to the Loan Documents as may be required by Lender, including execution and delivery of a Subordination of Management Agreement.

Any Property Management Agreement shall at all times be terminable without payment of a premium or fee immediately upon an Event of Default and otherwise upon not less than thirty (30) days' prior written notice; provided, however, that without the prior written consent of Lender, Borrower shall not enter into any new agreement, or modify, amend, supplement, assign, replace or terminate any existing agreement, in each case, which provides for the management, leasing and/or operation of any Property or Improvements.  All such agreements must expressly provide that they are subordinate to Lender's rights and interests under the Loan and the Loan Documents in all respects.  All property managers and leasing agents for any Property shall be subject to Lender's prior approval and, at Lender's request, Borrower shall cause each such property manager or leasing agent to execute and deliver to Lender a consent and agreement to the foregoing provisions in form and substance acceptable to Lender.

**9.17**    **MAINTENANCE**.  Borrower shall keep each Property in good condition and repair and shall provide security for each Property in at least the same manner as maintained on the date hereof.

**9.18**    **UTILITIES**.  Borrower shall pay when due all charges that are incurred by Borrower for the benefit of each Property for gas, telephone, electricity, water, sewer, or other services furnished to each Property.

**9.19**    **NO CHANGE IN USE**.  Each Property shall be used solely for its existing purposes and Borrower shall not permit any change in use or additional uses on such Property without the prior written consent of Lender.

**9.20**    **PATRIOT ACT AND RELATED MATTERS**.  Borrower and Guarantor shall comply with any and all existing and future Applicable Laws, including, without limitation, all Prescribed Laws.

**9.21**    **CONSTRUCTION COVENANTS**.  If Borrower has not achieved Construction Commencement in accordance with this Agreement by July 6, 2019, Borrower shall pay to Lender on such date, an amount equal to Five Hundred Fifty Thousand Dollars and No/100 ($550,000.00), which amount shall be applied by Lender to reduce the outstanding balance under the Note.

### ARTICLE 10.
### REPORTING COVENANTS

**10.1**    **FINANCIAL INFORMATION**.  Borrower shall deliver to Lender, as soon as available, but in no event later than thirty (30) days after each calendar year end, a current financial statement for Borrower (including, without limitation, an income and expense statement, rent roll and balance sheet) certified by an authorized representative of Borrower together with any other financial information reasonably required by Lender. In addition, Borrower shall deliver to Lender, as soon as available, but in no event later than twenty (20) days after the end of each calendar month, a current income and expenses statement and rent roll certified by Borrower (which shall also include aged payables and receivables). Borrower shall cause each Guarantor to deliver to Lender annual financial statements (including contingent liabilities) of Guarantor as applicable, within sixty (60) days after each calendar year end, and such other financial statements of each Guarantor for such other periods and to be delivered within such time periods as Lender may request, provided that Lender shall not request such reports for any periods more frequently than quarterly and within delivery time periods less than thirty (30) days of the end of the applicable quarter. Each Guarantor's financial statements shall be certified by an authorized representative of each Guarantor, as applicable, to be true and correct in all material aspects and not contain any material omissions. Notwithstanding anything to the contrary contained herein, if an Event of Default occurs, all financial

ATX000057

statements required hereunder shall be audited by an accounting firm approved by Lender in writing in its sole discretion.

(a) Borrower shall also deliver to Lender such quarterly and other financial information regarding any persons or entities in any way obligated on the Loan as Lender may specify and within such reasonable times as Lender may request. If in addition to the annual financial statements audited financial information is prepared, Borrower shall deliver to Lender copies of that information within twenty (20) days of its final preparation. All such financial information shall include a statement which specifies the accounting methodology used to prepare the information. Without limitation, all financial statements will include a calculation of Net Operating Income, delinquency reports, tenant and expenses payable and receivable reports, rent rolls and occupancy statistics and shall be certified by Borrower.

(b) If any statements, information or reports required hereunder (including under this Section 10.1, Sections 10.3, 10.4 and 10.5) are not timely delivered, there shall be an initial fee of $500.00 for the first day late and a subsequent fee of $250.00 per each day thereafter that such statements, information or reports are not delivered.

**10.2 BOOKS AND RECORDS.** Borrower shall maintain complete books of account and other records for each Property and Improvements and for disbursement and use of the proceeds of the Loan, and the same shall be available for inspection and copying by Lender upon reasonable prior notice.

**10.3 MONTHLY PROGRESS REPORTS ON RENOVATION TIMELINE.** In addition to any other reporting requirements contained herein, until such time as the Note is paid in full, within twenty (20) days after the end of each month, Borrower shall provide Lender with (i) a written statement that no renovations have taken place at any Property or (b) if renovations have taken place at any Property, a progress reports on the status of the renovation timeline (including Borrower's adherence to such timeline and any modifications to such timeline).

**10.4 LEASING REPORTS.** Borrower shall deliver to Lender monthly rent rolls, leasing schedules and reports, delinquency reports, occupancy statistics, lists of prospective tenants and property tours (which shall include a list of leasing prospects, proposals and the then-current negotiation status of the same, in such detail as Lender may require), operating statements, and/or such other leasing information as Lender shall request with respect to any Property and Improvements, each in form and substance reasonably satisfactory to Lender, within twenty (20) days of the end of the applicable month.

**10.5 OPERATING STATEMENTS FOR PROPERTY AND IMPROVEMENTS.** Until such time as the Note is paid in full, Borrower shall deliver to Lender monthly operating reports within twenty (20) days after the end of each month, and within twenty (20) days after the end of each quarter, which show in detail the amounts and sources of Gross Operating Income received by or on behalf of Borrower and the amounts and purposes of Permitted Operating Expenses paid by or on behalf of Borrower with respect to each Property and Improvements for the previous month.

(a) "Gross Operating Income" for this purpose shall mean the sum of any and all amounts, payments, fees, rentals, additional rentals, expense reimbursements (including, without limitation, all reimbursements by tenants, lessees, licensees and other users of each Property and Improvements), discounts or credits to Borrower, income, interest and other monies directly or indirectly received by or on behalf of or credited to Borrower from any person with respect to Borrower's ownership, use, development, operation, leasing, franchising, marketing or licensing of each Property and Improvements. Gross Operating Income shall be computed on a cash basis and shall include for each quarterly statement all amounts actually received in such quarter whether or not such amounts are attributable to a charge arising in such quarter.

(b)  "Permitted Operating Expenses" shall mean the following expenses, but only to the extent provided in the Operating Budget:  (i) taxes and assessments imposed upon each Property and Improvements to the extent that such taxes and assessments are required to be paid by Borrower and are actually paid or reserved for by Borrower; (ii) bond assessments; (iii) insurance premiums for casualty insurance (including, without limitation, earthquake) and liability insurance carried in connection with each Property and Improvements; (iv) operating expenses incurred by Borrower for the management, operation, cleaning, leasing, maintenance and repair of each Property and Improvements (provided, however, that any property management fees may not exceed the lesser of  three percent (3%) of the amount of Gross Rents), but in all events only to the extent provided in the Approved Budget.  Permitted Operating Expenses shall not include any interest or principal payments on the Loan or any allowance for depreciation.

**10.6**  **BUDGET**.  On or before December 1 of each year throughout the term of the Loan, as the same may be extended, Borrower shall submit to Lender for Lender's review and approval (a) a capital improvement budget for each Property which shall not include any payment to Borrower or any Affiliate unless expressly approved by Lender, in writing, in its sole discretion and (b) an operating budget (the "Operating Budget") for each Property (collectively with the Capital Improvement Budget, the "Approved Budget").  Borrower shall cause each Property to be owned and operated in accordance with the capital improvement budget and Operating Budget as approved by Lender, and shall make no changes to any such approved budgets without the prior written consent of Lender (provided, however, that overall deviations of ten percent shall not be deemed to be a violation of the provisions of this Section 10.6).  The budget for 2018 is attached as Exhibit C attached hereto.

## ARTICLE 11.
## EVENTS OF DEFAULT AND REMEDIES

**11.1**  **EVENT OF DEFAULT**.  The occurrence of any one or more of the following shall constitute an event of default (an "Event of Default") under this Agreement and the other Loan Documents:

(a)  Monetary.  Borrower's failure to pay when due any sums payable under the Note or any of the other Loan Documents within five (5) days when due (provided, however, that there shall be no grace period for amounts due at the Maturity Date or upon earlier acceleration and there shall be no grace period if a grace period is already provided under the applicable Loan Documents for such payments); or

(b)  Liens, Attachment; Condemnation.  (i) The recording of any claim of lien against any Property or Improvements or the service on Lender of any bonded stop notice relating to the Loan and the continuance of such claim of lien or bonded stop notice for thirty (30) days following notice without discharge, satisfaction or provision for payment being made by Borrower in a manner satisfactory to Lender; or (ii) [omitted]; or (iii) the sequestration or attachment of, or any levy or execution upon any of the Properties or Improvements, any other collateral provided by Borrower under any of the Loan Documents, any monies in the Reserves, or any substantial portion of the other assets of Borrower, which sequestration, attachment, levy or execution is not released, expunged or dismissed prior to the earlier of forty-five (45) days or the sale of the assets affected thereby; or

(c)  Representations and Warranties.  Any of Borrower's representations or warranties contained in the this Agreement or any other Loan Document was untrue in any material respect when made; or

(d)  Voluntary Bankruptcy; Insolvency; Dissolution. (i) The filing of a petition by Borrower for relief under the Bankruptcy Code, or under any other present or future state or federal law

regarding bankruptcy, reorganization or other debtor relief law; (ii) the filing of any pleading or an answer by Borrower in any involuntary proceeding under the Bankruptcy Code or other debtor relief law which admits the jurisdiction of the court or the petition's material allegations regarding Borrower's insolvency; (iii) a general assignment by Borrower for the benefit of creditors; or (iv) Borrower applying for, or the appointment of, a receiver, trustee, custodian or liquidator of Borrower or any of its property; or

        (e)     <u>Involuntary Bankruptcy</u>.  The failure of Borrower to effect a full dismissal of any involuntary petition under the Bankruptcy Code or under any other debtor relief law that is filed against Borrower or in any way restrains or limits Borrower or Lender regarding the Loan, any Property or the Improvements, prior to the earlier of the entry of any court order granting relief sought in such involuntary petition, or ninety (90) days after the date of filing of such involuntary petition; or

        (f)     <u>Partners; Corporate Guarantor; Limited Guarantor</u>.  The occurrence of any of the events specified in Section <u>11.1 (d)</u> or <u>11.1 (e)</u> as to any Guarantor; or

        (g)     <u>Transfer</u>.  Any Transfer occurs without the prior written consent of Lender in its sole and absolute discretion (except as may be expressly permitted by <u>Section 9.9</u> hereof); or

        (h)     <u>Loss of Priority</u>.  The failure at any time of the Security Instrument to be a valid first lien upon any Property and Improvements or any portion thereof, other than as a result of any release or reconveyance of the Security Instrument with respect to all or any portion of any Property and Improvements pursuant to the terms and conditions of this Agreement; or

        (i)     <u>Single Purpose Entity</u>.  Borrower shall fail to strictly comply with the provisions of <u>Section 9.10</u> (Single Purpose Entity); or

        (j)     <u>Key Person or Entity</u>.  The retirement, death, or incapacity of Guarantor or withdrawal of Guarantor from the operation of Borrower, and Borrower's failure to provide a substitute or replacement of such Person approved in writing by Lender in its sole discretion within sixty (60) days after the occurrence of any such retirement, death, incapacity or withdrawal; or

        (k)     <u>Environmental Indemnity Agreement</u>.  The occurrence of a default (after all notice and grace periods provided therein, if any, shall have expired) under the Environmental Indemnity Agreement; or

        (l)     <u>Guaranties</u>.  The occurrence of a default (after all notice and grace periods provided therein, if any, shall have expired) under the Carveout Guaranty; or

        (m)     <u>Other Payments</u>.  Borrower's failure to timely fund any Reserves as required hereunder if such failure continues for ten (10) Business Days following Borrower's receipt of written notice thereof from Lender; or

        (n)     <u>Permits; Utilities; Insurance</u>.  (i) The neglect, failure or refusal of Borrower to keep in full force and effect any material permit, license, consent or approval required for the operation of each Property that is not fully reinstated within thirty (30) days after Lender gives Borrower notice of the lapse of effectiveness of such material permit, license, consent or approval; (ii) the curtailment in availability to any Property of utilities or other public services necessary for the full occupancy and utilization of the Improvements that is not restored to full availability within thirty (30) days after Lender gives Borrower notice of such curtailment of availability; or (iii) the failure by Borrower to maintain any insurance required under this Agreement or any Loan Document; or

ATX000060

(o)     <u>Material Obligation</u>.  Failure of Borrower to pay when due any indebtedness or other liability of Borrower or any Property aggregating in excess of One Hundred Thousand and No/100 Dollars ($100,000.00) ("Material Indebtedness"); the default by Borrower in the performance (beyond the applicable grace period with respect thereto, if any) of any term, provision or condition contained in any agreement under which any Material Indebtedness was created or is governed; the occurrence of any other event or condition, the effect of which event or condition is to cause, or to permit the holder or holders of any Material Indebtedness to cause, such Material Indebtedness to become due prior to its stated maturity; or any Material Indebtedness of Borrower shall be declared to be due and payable or required to be prepaid or repurchased (other than by a regularly scheduled payment) prior to the stated maturity thereof;

(p)     <u>Other Default</u>.  The occurrence of an event of default under any other Loan Document or Borrower's default in the performance of any other term, covenant or condition contained in this Agreement or any other Loan Document which is not cured within thirty (30) days after written notice of such default given by Lender to Borrower.

**11.2     ACCELERATION UPON EVENT OF DEFAULT; REMEDIES**.     Upon the occurrence of any Event of Default specified in this Article 11, Lender may, at its sole option, declare all sums owing to Lender under the Note, this Agreement and the other Loan Documents immediately due and payable.  Upon such acceleration, Lender may, in addition to all other remedies permitted under this Agreement and the other Loan Documents and at law or in equity, apply any sums in the Reserves to the sums owing under the Loan Documents and any and all obligations of Lender to fund further disbursements under the Loan shall terminate.

**11.3     DISBURSEMENTS TO THIRD PARTIES**.  Upon the occurrence of an Event of Default occasioned by Borrower's failure to pay money to a third party as required by this Agreement, Lender may but shall not be obligated to make such payment from the Loan proceeds or other funds of Lender.  If such payment is made from proceeds of the Loan, Borrower shall immediately deposit with Lender, upon written demand, an amount equal to such payment.  If such payment is made from funds of Lender, Borrower shall immediately repay such funds upon written demand of Lender.  In either case, the Event of Default with respect to which any such payment has been made by Lender shall not be deemed cured until such deposit or repayment (as the case may be) has been made by Borrower to Lender.

**11.4     CONSTRUCTION CONSULTANT; LENDER'S COMPLETION OF CONSTRUCTION**.  Borrower acknowledges and agrees that if at any time following Lender's receipt of Construction Plans and Specifications and the Construction Schedule Lender deems the cost, pace or progress of construction at any Property to be unacceptable in Lender's discretion (or if Lender does not timely receive such Construction Plans and Specification and Construction Schedule in accordance with this Agreement), Lender may retain at Borrower's cost a Construction Manager to commence, continue, complete or advise as to the construction or development of the Improvements at any Property. The Construction Manager shall have no duty to Borrower. Upon the occurrence and continuance of an Event of Default, Lender may, upon five (5) days prior written notice to Borrower, and with or without legal process, take possession of any Property and Improvements, remove Borrower and all agents, employees and contractors of Borrower from any Property and Improvements, complete the work of any construction and market and lease any Property and/or Improvements.  For the limited purposes set forth in this Section 11.4, Borrower irrevocably appoints Lender as its attorney-in-fact, which agency is coupled with an interest. As attorney-in-fact, Lender may, in Borrower's name, take or omit to take any action Lender may deem appropriate, including, without limitation, exercising Borrower's rights under the Loan Documents and all contracts concerning any Property and/or Improvements.

**11.5** **REPAYMENT OF FUNDS ADVANCED**.  Any funds expended by Lender  in the exercise of its rights or remedies under this Agreement and the other Loan Documents shall be payable to Lender upon written demand, together with interest at the rate applicable to the principal balance of the Note from the date the funds were expended.

**11.6** **RIGHTS CUMULATIVE, NO WAIVER**.  All Lender's rights and remedies provided in this Agreement and the other Loan Documents, together with those granted by law or at equity, are cumulative and may be exercised by Lender at any time.  Lender's exercise of any right or remedy shall not constitute a cure of any Event of Default unless all sums then due and payable to Lender under the Loan Documents are repaid and Borrower has cured all other Events of Default.  No waiver shall be implied from any failure of Lender to take, or any delay by Lender in taking, action concerning any Event of Default or failure of condition under the Loan Documents, or from any previous waiver of any similar or unrelated Event of Default or failure of condition.  Any waiver or approval under any of the Loan Documents must be in writing and shall be limited to its specific terms.

## ARTICLE 12.
## MISCELLANEOUS PROVISIONS

**12.1** **INDEMNITY**.  BORROWER HEREBY AGREES TO DEFEND, INDEMNIFY AND HOLD HARMLESS LENDER, ITS DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS, SUCCESSORS AND ASSIGNS FOR, FROM AND AGAINST ANY AND ALL LOSSES, DAMAGES, LIABILITIES, CLAIMS, ACTIONS, JUDGMENTS, COURT COSTS AND LEGAL OR OTHER EXPENSES (INCLUDING, WITHOUT LIMITATION, ATTORNEYS' FEES AND EXPENSES), REGARDLESS OF WHETHER CAUSED IN WHOLE OR IN PART BY THE NEGLIGENCE OR STRICT LIABILITY OF LENDER OR ITS DIRECTORS, OFFICERS, PARTNERS, MEMBERS, EMPLOYEES, AGENTS, SUCCESSORS OR ASSIGNS, WHICH ANY SUCH PARTY MAY INCUR AS A DIRECT OR INDIRECT CONSEQUENCE OF: (A) THE PURPOSE TO WHICH BORROWER APPLIES THE LOAN PROCEEDS; (B) THE FAILURE OF BORROWER TO PERFORM ANY OBLIGATIONS AS AND WHEN REQUIRED BY THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS; (C) ANY FAILURE AT ANY TIME OF ANY OF BORROWER'S REPRESENTATIONS OR WARRANTIES TO BE TRUE AND CORRECT; OR (D) ANY ACT OR OMISSION BY BORROWER, CONSTITUENT PARTNER OR MEMBER OF BORROWER, ANY CONTRACTOR, SUBCONTRACTOR OR MATERIAL SUPPLIER, ENGINEER, ARCHITECT OR OTHER PERSON OR ENTITY WITH RESPECT TO ANY OF THE PROPERTIES OR IMPROVEMENTS. BORROWER SHALL IMMEDIATELY PAY TO LENDER UPON DEMAND ANY AMOUNTS OWING UNDER THIS INDEMNITY, TOGETHER WITH INTEREST FROM THE DATE THE INDEBTEDNESS ARISES UNTIL PAID AT THE RATE OF INTEREST APPLICABLE TO THE PRINCIPAL BALANCE OF THE NOTE. BORROWER'S DUTY AND OBLIGATIONS TO DEFEND, INDEMNIFY AND HOLD HARMLESS SUCH PARTIES SHALL SURVIVE CANCELLATION OF THE NOTE AND THE RELEASE, RECONVEYANCE OR PARTIAL RECONVEYANCE OF THE SECURITY INSTRUMENT.

**12.2** **FORM OF DOCUMENTS**.  The form and substance of all documents, instruments, and forms of evidence to be delivered to Lender under the terms of this Agreement and any of the other Loan Documents shall be subject to Lender's approval and shall not be modified, superseded or terminated in any respect without Lender's prior written approval.

**12.3** **NO THIRD PARTIES BENEFITED**.  No person other than Lender and Borrower and their permitted successors and assigns shall have any right of action under any of the Loan Documents.

ATX000062

**12.4**    **NOTICES**.  All notices or other communications required or permitted to be given pursuant to the provisions of this Agreement shall be in writing and shall be considered as properly given if delivered to the appropriate party at the address set forth below (subject to change from time to time by written notice to all other parties to this Agreement).  Except when otherwise required by law, any notice which a party is required or may desire to give the other shall be in writing and may be sent by e-mail (provided that a copy is simultaneously sent by one of the other permitted means of giving notice hereinafter set forth), by personal delivery or by mail (either (i) by United States registered or certified mail, return receipt requested, postage prepaid, or (ii) by Federal Express or similar generally recognized overnight carrier regularly providing proof of delivery).  Any notice so given by e-mail shall be deemed to have been given as of the date on which the sender of such communication shall confirm receipt thereof by the appropriate parties.  Any notice so given by mail shall be deemed to have been given as of the date of delivery established by U.S. Post Office return receipt or the overnight carrier's proof of delivery, as the case may be.  Any such notice not so given shall be deemed given upon receipt of the same by the party to whom the notice is to be given; provided, however, that non-receipt of any communication as the result of any change of address of which the sending party was not notified or as the result of a refusal to accept delivery shall be deemed receipt of such communication.  For purposes of notice, the addresses of the parties shall be:

| | |
|---|---|
| Borrower: | c/o World Class Capital Group, LLC<br>401 Congress, 33rd Floor<br>Austin, Texas<br>Attention:  Nate Paul |
| With a copy to: | c/o World Class Capital Group, LLC<br>767 Fifth Avenue, 16th Floor<br>New York, NY 10153<br>Attention:  Legal Department |
| Lender: | U.S. Real Estate Credit Holdings III-A, LP<br>c/o Calmwater Capital<br>11755 Wilshire Blvd., Suite 1425<br>Los Angeles, California 90025<br>Attention:  Larry Grantham, Managing Director |
| With a copy to: | Safarian, Choi & Bolstad LLP<br>555 South Flower St., Suite 650<br>Los Angeles, California 90071<br>Attention:  Alex Y. Choi, Esq. |

Any party shall have the right to change its address for notice hereunder to any other location within the continental United States by the giving of fifteen (15) days' notice to the other party in the manner set forth hereinabove.  Borrower shall forward to Lender, without delay, any notices, letters or other communications delivered to any Property or to Borrower naming Lender, "Lender" or any similar designation as addressee, or which is reasonably likely to affect the ability of Borrower to perform its obligations to Lender under the Loan Documents.

**12.5**    **ATTORNEY-IN-FACT**.  Upon the occurrence and during the continuance of an Event of Default, Borrower hereby irrevocably appoints and authorizes Lender, as Borrower's attorney-in-fact, which agency is coupled with an interest, to execute and/or record in Lender's or Borrower's name any

ATX000063

notices, instruments or documents that Lender deems appropriate to protect Lender's interest under any of the Loan Documents.

**12.6** **ACTIONS**. Borrower agrees that Lender, in exercising the rights, duties or liabilities of Lender or Borrower under the Loan Documents, may commence, appear in or defend any action or proceeding purporting to affect any Property, the Improvements, or the Loan Documents and Borrower shall immediately reimburse Lender upon written demand for all such expenses so incurred or paid by Lender, including, without limitation, attorneys' fees and expenses and court costs.

**12.7** **RIGHT OF CONTEST**. Borrower may contest in good faith any claim, demand, lien, levy or assessment by any person other than Lender which would constitute an Event of Default if: (a) Borrower pursues the contest diligently, in a manner which Lender determines is not prejudicial to Lender, and does not impair the rights of Lender under any of the Loan Documents; and (b) Borrower deposits with Lender any funds or other forms of assurance which Lender in good faith determines from time to time appropriate to protect Lender from the consequences of the contest being unsuccessful. Borrower's compliance with this <u>Section 12.7</u> shall operate to prevent such claim, demand, levy or assessment from becoming an Event of Default.

**12.8** **RELATIONSHIP OF PARTIES**. The relationship of Borrower and Lender under the Loan Documents is, and shall at all times remain, solely that of borrower and lender, and Lender neither undertakes nor assumes any responsibility or duty to Borrower or to any third party with respect to any Property or Improvements, except as expressly provided in this Agreement and the other Loan Documents.

**12.9** **DELAY OUTSIDE LENDER'S CONTROL**. Lender shall not be liable in any way to Borrower or any third party for Lender's failure to perform or delay in performing under the Loan Documents (and Lender may suspend or terminate all or any portion of Lender's obligations under the Loan Documents) if such failure to perform or delay in performing results directly or indirectly from, or is based upon, the action, inaction, or purported action, of any governmental or local authority, or because of war, rebellion, insurrection, strike, lock-out, boycott or blockade (whether presently in effect, announced or in the sole judgment of Lender deemed probable), or from any Act of God or other cause or event beyond Lender's control.

**12.10** **ATTORNEYS' FEES AND EXPENSES; ENFORCEMENT**. If any attorney is engaged by Lender to enforce or defend any provision of this Agreement, any of the other Loan Documents or Other Related Documents, or as a consequence of any Event of Default under the Loan Documents, with or without the filing of any legal action or proceeding, and including, without limitation, any fees and expenses incurred in any bankruptcy proceeding of the Borrower, then Borrower shall immediately pay to Lender, upon demand, the amount of all attorneys' fees and expenses and all costs incurred by Lender in connection therewith, together with interest thereon from the date of such demand until paid at the rate of interest applicable to the principal balance of the Note as specified therein.

**12.11** **IMMEDIATELY AVAILABLE FUNDS**. Unless otherwise expressly provided for in this Agreement, all amounts payable by Borrower to Lender shall be payable only in United States currency, immediately available funds.

**12.12** **LENDER'S CONSENT**. Wherever in this Agreement there is a requirement for Lender's consent, determination and/or a document to be provided or an action taken "to the satisfaction of Lender", except as otherwise expressly set forth herein, it is understood by such phrase that Lender shall exercise its consent, right or judgment in its sole and absolute discretion.

ATX000064

**12.13  LOAN SALES AND PARTICIPATIONS; DISCLOSURE OF INFORMATION**. Borrower agrees that Lender may elect, at any time, to sell, assign or grant participations in all or any portion of its rights and obligations under the Loan Documents, and that any such sale, assignment or participation may be to one or more financial institutions, private investors, and/or other entities, at Lender's sole discretion ("Participant").  Borrower further agrees that Lender may disseminate to any such actual or potential purchaser(s), assignee(s) or participant(s) all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to:  (a) any Property and Improvements and its operation; (b) any party connected with the Loan (including, without limitation, Borrower, any Person having any interest, whether direct or indirect, in Borrower, any constituent partner or member of Borrower, and any Guarantor); and/or (c) any lending relationship other than the Loan which Lender may have with any party connected with the Loan.  In the event of any such sale, assignment or participation, Lender and the parties to such transaction shall share in the rights and obligations of Lender as set forth in the Loan Documents only as and to the extent they agree among themselves.  In connection with any such sale, assignment or participation, Borrower further agrees that the Loan may be split into two or more loans with the economic terms materially the same as provided herein and in the other Loan Documents, the Loan Documents shall be sufficient evidence of the obligations of Borrower to each purchaser, assignee, or participant, and upon written request by Lender, Borrower shall enter into such amendments or modifications to the Loan Documents as may be reasonably required in order to evidence any such sale, assignment or participation.  The indemnity obligations of Borrower under the Loan Documents shall also apply with respect to any Participant.

**12.14  SECONDARY MARKET TRANSACTION; DISCLOSURE OF INFORMATION**. Borrower acknowledges that Lender may effectuate one or more Secondary Market Transactions.  At no out-of-pocket expense to Borrower, Borrower shall cooperate in all respects with Lender (and agrees to cause its Affiliates and their respective officers and representatives to cooperate) in effecting any such Secondary Market Transaction and shall cooperate in all respects (and agrees to cause its Affiliates and their respective officers and representatives to cooperate) to implement all requirements imposed by any Investment Party or Rating Agency involved therein, including, without limitation, by executing amendments to Borrower's organizational documents (including, without limitation, Borrower's organizational chart) and/or the obligations evidenced by the Note and this Agreement and secured by the Security Instrument, and modifications to any Loan Documents, and by delivering an estoppel certificate acceptable to Lender within ten (10) days of Lender's request and such other documents as may be reasonably requested by Lender, which may include, among other things, opinions of counsel (including, if requested by Lender, a so-called "substantive non-consolidation" opinion with respect to Borrower and its Affiliates acceptable to Lender in its sole discretion at Borrower's sole cost and expense).  Borrower shall provide such information and documents relating to Borrower, any Guarantor, any Property and any tenants as Lender may reasonably request in connection with such Secondary Market Transaction. Borrower shall make available to Lender all information concerning its business and operations that Lender may reasonably request.  Lender shall be permitted to share all information provided in connection with the Loan with the Investment Parties, Rating Agencies, investment banking firms, accounting firms, law firms and other third-party advisory firms involved with the Loan Documents or the applicable Secondary Market Transaction, including without limitation, all documents and information (including, without limitation, all financial information) which has been or is hereafter provided to or known to Lender with respect to: (a) any Property and Improvements and its operation; (b) any party connected with the Loan (including, without limitation, Borrower, any Person having any interest, whether direct or indirect, in Borrower, any constituent partner or member of Borrower and any Guarantor); and/or (c) any lending relationship other than the Loan which Lender may have with any party connected with the Loan.  It is understood that the information provided to Lender in connection with the Loan may ultimately be incorporated into the offering documents for the Secondary Market Transaction and thus potential Investment Parties may also see some or all of the information with respect to the Loan, any Guarantor, any Property, Borrower and the holders of direct or indirect interests in Borrower.  Borrower irrevocably waives any and all rights it may

ATX000065

have under any Applicable Laws (including, without limitation, any right of privacy) to prohibit such disclosure.  Lender and all of the aforesaid third-party advisors and professional firms shall be entitled to rely on the information supplied by, or on behalf of, Borrower.  Borrower hereby agrees to indemnify, defend and hold the Lender Indemnified Parties harmless as to any losses, damages, costs, expenses, liabilities (including, without limitation, strict liability), claims, obligations, settlement payments, penalties, fines, assessments, citations, litigation, demands, defenses, judgments, suits, proceedings or other expenses of any kind whatsoever (including attorneys' fees and expenses and court costs), that arise out of or are based upon any untrue statement or alleged untrue statement of any material fact contained in the information provided by or on behalf of Borrower, or arise out of or are based upon the omission or alleged omission by Borrower to state therein a material fact required to be stated in such information, or necessary in order to make the statements in such information, or in light of the circumstances under which they were made, not misleading.  Lender may publicize the existence of the Loan or Borrower's obligations under the Loan in connection with its marketing for a Secondary Market Transaction or otherwise as part of its business development.

      **12.15**  <u>**RESERVED.**</u>

      **12.16**  <u>**LENDER'S AGENTS**</u>.  Lender may designate an agent or independent contractor to exercise any of Lender's rights under this Agreement and any of the other Loan Documents.  Any reference to Lender in any of the Loan Documents shall include Lender's agents, employees or independent contractors.

      **12.17**  <u>**TAX SERVICE**</u>.  Lender is authorized to secure, at Borrower's expense, a tax service contract with a third party vendor which shall provide tax information on any Property and Improvements satisfactory to Lender.

      **12.18**  <u>**WAIVER OF RIGHT TO TRIAL BY JURY**</u>.  EACH PARTY TO THIS AGREEMENT HEREBY EXPRESSLY WAIVES ANY RIGHT TO TRIAL BY JURY OF ANY CLAIM, DEMAND, ACTION OR CAUSE OF ACTION (a) ARISING UNDER THE LOAN DOCUMENTS, INCLUDING, WITHOUT LIMITATION, ANY PRESENT OR FUTURE MODIFICATION THEREOF OR (b) IN ANY WAY CONNECTED WITH OR RELATED OR INCIDENTAL TO THE DEALINGS OF THE PARTIES HERETO OR ANY OF THEM WITH RESPECT TO THE LOAN DOCUMENTS (AS NOW OR HEREAFTER MODIFIED) OR ANY OTHER INSTRUMENT, DOCUMENT OR AGREEMENT EXECUTED OR DELIVERED IN CONNECTION HEREWITH, OR THE TRANSACTIONS RELATED HERETO OR THERETO, IN EACH CASE WHETHER SUCH CLAIM, DEMAND, ACTION OR CAUSE OF ACTION IS NOW EXISTING OR HEREAFTER ARISING, AND WHETHER SOUNDING IN CONTRACT OR TORT OR OTHERWISE; AND EACH PARTY HEREBY AGREES AND CONSENTS THAT ANY PARTY TO THIS AGREEMENT MAY FILE AN ORIGINAL COUNTERPART OR A COPY OF THIS SECTION WITH ANY COURT AS WRITTEN EVIDENCE OF THE CONSENT OF THE PARTIES HERETO TO THE WAIVER OF ANY RIGHT THEY MIGHT OTHERWISE HAVE TO TRIAL BY JURY.

      **12.19**  <u>**SEVERABILITY**</u>.  If any provision or obligation under this Agreement and the other Loan Documents shall be determined by a court of competent jurisdiction to be invalid, illegal or unenforceable, that provision shall be deemed severed from the Loan Documents and the validity, legality and enforceability of the remaining provisions or obligations shall remain in full force as though the invalid, illegal, or unenforceable provision had never been a part of the Loan Documents; <u>provided</u>, <u>however</u>, that if the rate of interest or any other amount payable under the Note or this Agreement or any other Loan Document, or the right of collectability therefor, are declared to be or become invalid, illegal or unenforceable, Lender's obligations to make advances under the Loan Documents shall not be enforceable by Borrower.

ATX000066

**12.20    HEIRS, SUCCESSORS AND ASSIGNS**.  Except as otherwise expressly provided under the terms and conditions of this Agreement, the terms of the Loan Documents shall bind and inure to the benefit of the heirs, successors and assigns of the parties.

**12.21    TIME**.  Time is of the essence of each and every term of this Agreement.

**12.22    HEADINGS**.  All article, section or other headings appearing in this Agreement and any of the other Loan Documents are for convenience of reference only and shall be disregarded in construing this Agreement and any of the other Loan Documents.

**12.23    GOVERNING LAW**.  THIS AGREEMENT AND THE OBLIGATIONS ARISING HEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF TEXAS.

**12.24    INTEGRATION; INTERPRETATION**.  The Loan Documents contain or expressly incorporate by reference the entire agreement of the parties with respect to the matters contemplated therein and supersede all prior negotiations or agreements, written or oral. The Loan Documents shall not be modified except by written instrument executed by all parties. Any reference to the Loan Documents includes any amendments, renewals or extensions now or hereafter approved by Lender in writing.

**12.25    JOINT AND SEVERAL LIABILITY**.  The liability of all persons and entities obligated in any manner under this Agreement and any of the Loan Documents shall be joint and several.

**12.26    COUNTERPARTS**.  To facilitate execution, this Agreement may be executed in as many counterparts as may be convenient or required. It shall not be necessary that the signature of, or on behalf of, each party, or that the signature of all persons required to bind any party, appear on each counterpart. All counterparts shall collectively constitute a single document.  It shall not be necessary in making proof of this Agreement to produce or account for more than a single counterpart containing the respective signatures of, or on behalf of, each of the parties hereto.  Any signature page to any counterpart may be detached from such counterpart without impairing the legal effect of the signatures thereon and thereafter attached to another counterpart identical thereto except having attached to it additional signature pages. Facsimile and other electronically transmitted signatures shall serve as the functional equivalent of manually executed signatures for all purposes.

**12.27    CONFIDENTIALITY AND PUBLICITY**.

(a)    Borrower hereby agrees that Lender or any Affiliate of Lender may (i) disclose a general description of transactions arising under the Loan Documents for advertising, marketing or other similar purposes, (ii) use Borrower's or any Guarantor's names, logos or other indicia germane to such parties in connection with such advertising, marketing or other similar purposes and (iii) disclose any and all information concerning the Loan Documents, as well as any information regarding the Borrower or any Guarantor and their operations, received by Lender in connection with the Loan Documents required by its lenders or funding or financing sources

(b)    Borrower agrees, and agrees to cause each of its Affiliates, (i) not to transmit or disclose provision of any Loan Document to any Person (other than to Borrower's advisors and officers on a need-to-know basis) without Lender's prior written consent, (ii) to inform all Persons of the confidential nature of the Loan Documents and to direct them not to disclose the same to any other Person and to require each of them to be bound by these provisions.  Borrower agrees to submit to Lender and Lender reserves the right to review and approve all materials that Borrower or any of its Affiliates prepares that contain Lender's name or describe or refer to any Loan Document, any of the terms thereof or any of the transactions

ATX000067

contemplated thereby.  Borrower shall not, and shall not permit any of its Affiliates to, use Lender's name (or the name of any of Lender's Affiliates) in connection with any of its business operations, including without limitation, advertising, marketing or press releases or such other similar purposes, without Lender's prior written consent.  Nothing contained in any Loan Document is intended to permit or authorize Borrower or any of its Affiliates to contract on behalf of Lender.

**12.28** **BROKERS**.  Borrower hereby represents that it has dealt with no financial advisors, brokers, underwriters, placement agents, agents or finders in connection with the transactions contemplated by this Agreement.  Borrower shall indemnify, defend and hold Lender harmless for, from and against any and all claims, liabilities, costs and expenses of any kind (including Lender's attorneys' fees and expenses) in any way relating to or arising from a claim by any Person that such Person acted on behalf of Borrower or Lender in connection with the transactions contemplated herein, regardless of whether caused in whole or in part by the negligence or strict liability of Lender.  The provisions of this Section 12.28 shall survive the expiration and termination of this Agreement and the payment of the Loan.

**12.29** **OFFSETS AND COUNTERCLAIMS**.  Borrower hereby waives the right to assert a counterclaim, other than a compulsory counterclaim, in any action or proceeding brought against it by Lender or its agents, including any servicer of Borrower, or otherwise offset any obligations to make payments required under the Loan Documents.

**12.30** **REMEDIES OF BORROWER**.  If a claim or adjudication is made that Lender or any of its agents, including any servicer of Borrower, has acted unreasonably or unreasonably delayed acting in any case where by law or under any Loan Document, Lender or any such agent, as the case may be, has an obligation to act reasonably or promptly, Borrower agrees that neither Lender nor its agents, including any servicer of Borrower, shall be liable for any monetary damages, and Borrower's sole remedy shall be to commence an action seeking injunctive relief or declaratory judgment.  Any action or proceeding to determine whether Lender has acted reasonably shall be determined by an action seeking declaratory judgment.  Borrower specifically waives any claim against Lender and its agents, including any servicer of Borrower, with respect to actions taken by Lender or its agents on Borrower's behalf, other than any such claim arising from the gross negligence or willful misconduct of Lender or such agent.

**12.31** **PRINCIPLES OF CONSTRUCTION**.  Unless otherwise specifically provided, (a) all references to sections and schedules are to those in this Agreement or the other applicable Loan Document, as the context requires, (b) the words "hereof," "herein" and "hereunder" and words of similar import refer to this Agreement or the other applicable Loan Document, as the context requires, as a whole and not to any particular provision, (c) all definitions are equally applicable to the singular and plural forms of the terms defined, (d) the word "including" means "including but not limited to," (e) accounting terms not specifically defined herein shall be construed in accordance with GAAP, (f) the words "Property" and "Properties" shall be deemed followed by the words "or any part thereof," (g) the term "knowledge" of a Person means the actual knowledge of such Person, after having made due inquiry and investigation and (h) whenever pursuant to this Agreement or any agreement, instrument or document contemplated herein, Lender exercises any right given to it to approve or disapprove, or consent or withhold consent, or any arrangement or term is to be satisfactory or acceptable to Lender or is to be in Lender's discretion, the decision of Lender to approve or disapprove, to consent or withhold consent, or to decide whether arrangements or terms are satisfactory or not satisfactory, or acceptable or unacceptable or in Lender's discretion shall (unless otherwise expressly provided) be in the sole and absolute discretion of Lender and shall be final and conclusive.

**[END OF TEXT; SIGNATURES FOLLOW ON NEXT PAGE(S)]**

IN WITNESS WHEREOF, Borrower and Lender have executed this Agreement as of the date appearing on the first page of this Agreement.

**LENDER:**

**U.S. REAL ESTATE CREDIT HOLDINGS III-A, LP,**
an Irish limited partnership, acting by its
General Partner, U.S. Real Estate Credit
Holdings III-A GP Limited

By:     Calmwater Asset Management, LLC,
        a Delaware limited liability company,
        its Investment Manager

        By:
        Name: Larry W. Grantham Jr.
        Title: Authorized Signatory

**[SIGNATURES CONTINUE ON FOLLOWING PAGE]**

**BORROWER**:

**900 CESAR CHAVEZ, LLC,**
a Delaware limited liability company,

By: _____
    Name: Natin Paul
    Title: President

**905 CESAR CHAVEZ, LLC,**
a Delaware limited liability company,

By: _____
    Name: Natin Paul
    Title: President

**5TH AND RED RIVER, LLC,**
a Delaware limited liability company,

By: _____
    Name: Natin Paul
    Title: President

**7400 SOUTH CONGRESS, LLC,**
a Delaware limited liability company,

By: _____
    Name: Natin Paul
    Title: President

**[SIGNATURE PAGE TO LOAN AGREEMENT]**

ATX000070

## SCHEDULE I

## ORGANIZATIONAL CHART

## [ATTACHED]

ATX000071



ATX000072

## EXHIBIT A-1

## DESCRIPTION OF 5th PROPERTY

TRACT 1: Lot 2, Block 60 of the Original City of Austin, Travis County, Texas, according to the Plat on file at the General Land Office of the State of Texas, SAVE AND EXCEPT the West 18 inches of the South 40 feet 6 inches as described in instrument recorded in Volume 365, Page 403 of the Deed Records of Travis County, Texas.

TRACT 2: Lots A and B, LINAM NO. 1, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in Volume 80, Page 182 of the Plat Records of Travis County, Texas.

ATX000073

## EXHIBIT A-2

## DESCRIPTION OF 900 CESAR CHAVEZ PROPERTY

Lots 1, 2, 3 and 4, Block 4, JAMES HARRINGTON'S SUBDIVISION OF OUTLOT 17, DIVISION "O", according to the map or plat thereof, recorded in Volume X, Page 636, Plat Records, Travis County, Texas.

ATX000074

## EXHIBIT A-3

## DESCRIPTION OF 905 CESAR CHAVEZ PROPERTY

Lots 8 and 9, Block 1, R. W. MAGUIRE'S SUBDIVISION OF OUTLOTS 31 AND 32, DIVISION O, a subdivision in Travis County, Texas, according to the map or plat thereof, recorded in Volume 2, Page 165 of the Plat Records of Travis County, Texas, as further affected by Boundary Line Agreement and Special Warranty Deed dated January 4, 2002, recorded under Document No. 2002008652 of the Official Public Records of Travis County, Texas.

ATX000075

## EXHIBIT A-4

## DESCRIPTION OF CONGRESS PROPERTY

Tract 1:

ALL THAT CERTAIN TRACT OR PARCEL OF LAND LYING AND BEING SITUATED IN TRAVIS COUNTY, TEXAS, BEING 5.133 ACRES OF LAND LOCATED IN THE WILLIAM CANNON LEAGUE, ABSTRACT NO. 6, IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, BEING A PORTION OF A 5.65 ACRE TRACT OF LAND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

BEGINNING at an iron pin found at the northwest corner of the above mentioned 5.65 acre tract of land, said point being in the east line of Meadowcreek, Section 2, Phase 2, a subdivision in Austin, Travis County, Texas according to the plat recorded in Book 71, Page 31, of the Travis County Plat Records and from which point an trot pin found at the southeast corner of Lot 8 Block H, Meadowcreek, Section 2, Phase 2, bears South 71 deg.17'00" East, 91.80 feet;

THENCE with the north line of said 5.65 acre tract, South 71 deg.17'00" East, 710.20 feet to an iron pin found for the northeast corner of said 5.113 acre and hereof, and from which point an iron pin found at the northeast corner of a 1.44 acre tract;

THENCE South 14 deg.32' West, 310.50 feet to an iron pin found for the southeast corner of said 5.113 acre tract and hereof, and southwest corner of said 1.440 acre tract; pin being on north line of 2.2686 acre tract of Humble Pipe Line Co.

THENCE with the north line of said Humble Pipe Line Co. tract, North 75 deg.28'00" West, 622.23 feet to an iron pin found in the east line of Meadowcreek, Section 2, Phase 2, for the southwest corner of said 5.65 acre tract and hereof, and for the northwest corner of the Humble Pipe Line Co. Tract;

THENCE with the east line of Meadowcreek, Section 2, Phase 2, North 01 deg.10'00" East at 102.98 feet passing the northwest corner of Lot 5, Block M, Meadowcreek, Section 2 Phase 2, in all a distance of 372.40 feet to the POINT OF THE BEGINNING, containing in all 5.113 acres of land more or less.

Tract 2:

BEING A TRACT OR PARCEL OF LAND SITUATED IN TRAVIS COUNTY, TEXAS, BEING OUT OF AND A PART OF THE WILLIAM CANNON LEAGUE, ABSTRACT NO. 6, IN THE CITY OF AUSTIN, TRAVIS COUNTY, TEXAS, OUT 5.65 ACRE TRACT AND A .09 ACRE TRACT, DESCRIBED BY THE BOUNDARY LINE AGREEMENT RECORDED IN VOLUME 4862, PAGE 1328 OF THE TRAVIS COUNTY DEED RECORDS, AND BEING THE SAME TRACT OF LAND DESCRIBED AS TRACT 2 IN A DEED FROM ISAM KUSSAD AND JOYCE KUSSAD, HUSBAND AND WIFE, TO SERGIO LOZANO-SANCHEZ AND MARION SANCHEZ-LOZANO, DATED FEBRUARY 19, 2003 AND RECORDED IN 2003045409 OF THE OFFICIAL PUBLIC RECORDS OF TRAVIS COUNTY, TEXAS, AND BEING MORE PARTICULARLY DESCRIBED BY METES AND BOUNDS AS FOLLOWS:

COMMENCING at a 1/2" iron rod found in the Southeast corner of this tract, and in the west right-of-way line of U.S. Highway 81 (South Congress Avenue), and the Northeast corner of that 2.2686 tract of land

ATX000076

conveyed to Humble Pipeline Company by deed recorded in Volume 993, Page 101 of the Deed Records of Travis County, Texas, and which point is also POINT OF BEGINNING of the herein described tract;

THENCE with the South line of this tract and the north line of the Humble Pipeline Company tract North 75°32'24" West at a distance of 376. 78 feet to a 1" iron pipe found at the Southwest corner of this tract and the Southeast corner of a 4.95 acre tract of land conveyed to Pecan Grove Joint Venture by deed recorded in Volume 7581, Page 179 of the Deed Records of Travis County, Texas;

THENCE with the west line of this tract and the east line of the Pecan Grove Joint Venture tract North 14 deg.35'56" East at a distance of 309.60 feet to a 1/2" iron rod found at the Northwest corner of this tract and the Northeast corner of the Pecan Grove Joint Venture tract, and a point in the south line of Lot 1A of Sarah Ann Fritts Subdivision;

THENCE with the North line of this tract and the south line of Lot 1A of Sarah Ann Fritts Subdivision South 71 deg.14'57" East at a distance of 31.27 feet to a 1/2" iron rod found at the Northeast corner of this tract and the Northwest corner of Lot 1 of The Ennis Subdivision, a Travis County subdivision recorded in Volume 82, Page 20, Plat Records, Travis County, Texas;

THENCE with the East line of this tract and the west line of Lot 1 of The Ennis Subdivision South 06 deg.08'54" West at a distance cf 155.84 feet to a 1/2" iron rod found at a corner of this tract in the North line of this tract and the Southwest corner of Lot 1 of The Ennis Subdivision;

THENCE with the North line of this tract and the south line of Lot 1 of The Ennis Subdivision South 73 deg. 11 '02" East at a distance of 324.92 feet to a 1/2" iron rod found at the Northeast corner of this tract and the Southeast corner of Lot 1 of The Ennis Subdivision, and in the west right-of-way line of U.S. Highway 81 (South Congress Avenue);

THENCE with the East line of this tract and the west line of U.S. Highway 81 (South Congress Avenue) South 15 deg.24'48" West at a distance of 139.72 feet to a 1/2" iron rod found in the Southeast corner of this tract, and in the west right-of-way line of U.S. Highway 81 (South Congress Avenue), and the Northeast corner of the Humble Pipeline Company tract, and being the POINT OF BEGINNING, containing 1.4296 acres of land, more or less.

Tract 3:

Lot 1, of ENNIS SUBDIVISION, an addition in Travis County, Texas, according to the map or plat thereof recorded in Plat Book 82, Page 20, of the Plat Records of Travis County, Texas.

ATX000077

## EXHIBIT B

## DOCUMENTS

I.  <u>Loan Documents</u>.  The documents listed in this <u>Section I</u>, and amendments, modifications and supplements thereto which have received the prior written consent of Lender, together with any documents executed in the future that are approved by Lender and that recite that they are "Loan Documents" for purposes of this Agreement are collectively referred to herein as the Loan Documents.

1. This Agreement.

2. The Promissory Note dated as of the date hereof, in the maximum principal amount of $22,932,250, made by Borrower payable to the order of Lender.

3. The Deed of Trust, Security Agreement and Financing Statement dated as of the date hereof, executed by Borrower, as Trustor, to the trustee named therein, for the benefit of Lender.

4. Uniform Commercial Code – National Financing Statement – Form UCC-1, showing Borrower, as debtor, and Lender, as secured party, to be filed with the Secretary of State of the State of Texas.

5. Uniform Commercial Code – National Financing Statement – Form UCC-1, showing Borrower, as debtor, and Lender, as secured party, to be recorded in the Official Records.

6. Assignment of Leases and Rents dated as of the date hereof, executed by Borrower and Lender.

7. Notice of Final Agreement dated as of the date hereof, executed by Borrower.

8. Indemnity and Guaranty Agreement dated as of the date hereof, executed by Guarantor in favor of Lender.

9. Hazardous Substances Indemnity Agreement dated as of the date hereof, executed by the Borrower and Guarantor in favor.

10. Collateral Assignment of Interest Rate Cap Agreement dated as of the date hereof.

**<u>EXHIBIT C</u>**

**<u>Approved Budget</u>**

**N/A**

**ATX000079**

## EXHIBIT D

## FINANCIAL REQUIREMENTS ANALYSIS

| PROPERTY:<br><br>_____<br>_____, TX | (A)<br>TOTAL COSTS | (B)<br>COSTS PAID<br>BY BORROWER | (C)<br>COSTS TO BE PAID<br>BY BORROWER | (D)<br>DISBURSEMENT<br>BUDGET |
|---|---|---|---|---|
| 1. Acquisition Cost/Loan Commitment Fee and Closing Costs/ Legal/ Due Diligence | | | | |
| 2. Capital Improvement Holdback | | | | |
| 3. Interest Holdback | | | | |
| TOTALS | | | | |

ATX000080

**EXHIBIT E**

**FORM OF DISBURSEMENT REQUEST**

_____
_____
Attention:

Re:      _____ ("Borrower")


Dear_____:

Pursuant to the terms of that certain Loan Agreement dated as of _____, 20__ (as modified, amended and/or supplemented from time to time, the "Loan Agreement"), and the representations and warranties set forth therein and herein, Borrower hereby submits a disbursement request for the amount of $_____ (the "Loan").  Capitalized terms have the same meanings as in the Loan Agreement.

This disbursement request ("Request") shall be deemed to be a representation by Borrower and of the person/entity signing this Request (in the case of the person/entity signing this Request, to person's/entity's knowledge) that (A) no Event of Default has occurred or will exist (and no event that with the passage of time or giving of notice has occurred or will exist that would constitute an Event of Default) upon the making of this requested disbursement; (B) the representations and warranties contained herein and in the other Loan Documents as of the date hereof are true and correct in all material respects; (C) all information set forth in this Request; and on any exhibit attached hereto is true, correct and complete in all material respects; and (D) all conditions precedent to the disbursement to be made in connection with this Request have been satisfied.

     (a)     the Borrower has received no notice and has no knowledge of any litigation, proceedings (including proceedings under Title 11 of the United States Code), liens or claims of lien, either filed or threatened against the Borrower, any Guarantor or the Property, except the liens of the Lender and those which have heretofore been specifically identified in writing to the Lender;

     (b)     no event, circumstance or condition exists or has occurred which could delay or prevent the completion of the Property by the [Completion Date];

     (c)     all construction related disbursements advanced by the Lender to the Borrower for labor, materials and/or services furnished prior to this draw request have been paid to the parties entitled to such payment, and all Loan proceeds so disbursed have been used for the purposes set forth in the Loan Agreement;

     (d)     all work and materials furnished to date for the Property conform with the [Approved Plans and Specifications], and the Borrower has approved all work and materials for which a payment is now due and for which this construction disbursement is being requested;

ATX000081

(e)       the total amount of the requested construction disbursement represents the actual amount payable to the general contractor and/or subcontractors who have performed work on the Project, and all of the construction disbursement requested hereby will be used as payment for the work on the Property described on the attached documentation and for no other reason;

(f)       [all change orders or changes to the Approved Plans and Specifications or the schedule of values have been submitted to and approved by Lender]; and

(g)       the Loan is In Balance (including, without limitation, any change orders approved by the Lender).

The following is an itemized statement of the costs incurred or due for which disbursement is requested with respect to Item __ shown in Column D ("Disbursement Budget") in the Financial Requirements Analysis attached as Exhibit D to the Loan Agreement, and the total amount incurred, expended and/or due for Item __ less prior disbursements.

| ITEM | TOTAL AMOUNT INCURRED LESS PRIOR DISBURSEMENTS |
|---|---|
| 1) | |
| 2) | |
| TOTAL DISBURSEMENT REQUEST | |

This Request is submitted as of _____, 20__.

[BORROWER]
By: ____
Name: _
Title: __

ATX000082

**EXHIBIT F**

**RENT ROLL AND LIST OF LEASES**

**N/A**

ATX000083